**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE COMPLAINT AND PETITION OF** | * | **CIVIL ACTION NO.: 4:10-cv-01721** |
| **TRITON ASSET LEASING, GmbH, et al** | * | |
| | * | **Fed. R. Civ. P. 9(h)** |
| | * | |
| | * | **IN ADMIRALTY** |
| | * | |
| | * | **This pleading relates to** *Charles* |
| | * | *Schmalz, et al v. Transocean, Ltd., et al*, |
| | * | USDC-EDLA no. 2:10-cv-01452 |

**************************************************

<u>**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER**</u>

**MAY IT PLEASE THE COURT:**

Claimants-In-Limitation and Movants herein, Kevin Black, John B. Canty, IV, Chad Conzonere, Michael Troy Crain, Brad Crawford, William J. Crawford, Alvery L. Efferson, Charles Efferson**,** Robert Evans, Jr., Michael Ferrier, Wayne Gagliano, Kevin M. Jackson, Dennis Knecht, Jr., Fred Knecht, Jr., Robert Kreger, Ronald A. Kreger, Jr., Roy Kreger, Sr., Ryan A. Kreger, William H. Lyncker, III, Shannon D. Moragas, Christopher Pomes, Allen J. Raimer, John C. Roberts, Gerald J. Sander, Jr., David A. Segrave, Jr., David A. Segrave, Sr., Michael A. Segrave, Charles Schmalz and Ronald A. Kreger, Sr.[1] (collectively, "Movants" or "the *Schmalz* Claimants") filed a Complaint in proceedings entitled *Charles Schmalz, et al v. Transocean Ltd., et al,* no.10-1452 ("the *Schmalz* litigation"). The case is pending before the U.S. District Court for the Eastern District of Louisiana, Section J, the Honorable Carl Barbier.

In response to that Complaint, Transocean Offshore Deepwater Drilling, Inc.,

---

[1] The *Schmalz* Plaintiffs all filed individually; in addition to filing individually, Mr. Schmalz and Mr. Ronald Kreger, Sr. also filed a class action on behalf of crab fishermen licensed in Louisiana as of April 20, 2010.

Transocean Deepwater, Inc., and Transocean Holdings, LLC (collectively with Triton Asset Leasing GmbH referred to herein as "Transocean") filed a "Notice of Filing of Limitation, Entry of Stay Order, and Injunction Against Further Prosecution of Claims" ("Notice") in the *Schmalz* litigation on May 14, 2010. [USDC-EDLA no. 2:10-cv-1452, Rec. Doc. 2]

Movants have joined with numerous others in asking that this Limitation action be transferred to the United States District Court for the Eastern District of Louisiana. [**Rec. Doc. 42**] Movants hereby also join with others who, in additional motions, have made similar requests to transfer this matter to the Eastern District of Louisiana. [**Rec.Doc. 12, 20, 31, 32.**]

This Court issued an Order in this matter [**Rec. Doc. 9**] and an Amended Order [**Rec. Doc. 61**] requiring Claimants to file their claims against Transocean on or before November 15, 2010.  Movants have not yet filed their claims, but the deadline has not yet expired.

Pursuant to a Status Conference held on May 25, 2010, this Court issued a Minute Entry asking for additional briefing on the following four issues:

(1)    whether the current movants have standing to raise the issues now before the Court;

(2)    what issues, if any, should be taken up prior to any determinations by the JPML;

(3)    whether and in what way the Court's current injunction order should be modified; and,

(4)    whether the limitation action should be dismissed entirely.

This Memorandum will address these four issues.

**I.    WHETHER THE CURRENT MOVANTS HAVE STANDING**

_____This Court has questioned whether Movants have standing to raise the issue of transfer, given that they have not yet filed Answers and Claims with this Court. As required by F.R.C.P. art. 12(b)(3), prior to filing a responsive pleading, Movants objected to the improper venue of this proceeding in the Southern District of Texas, Houston Division, and moved to

transfer it to the appropriate venue, the Eastern District of Louisiana, where it can be consolidated with the *Schmalz* litigation and other related matters. The Federal Rules do <u>not</u> require the filing of an Answer or a Claim before objecting to venue and requesting a transfer; moreover, requiring Movants to file a Claim and/or Answer first might have deprived Movants of the ability to object to the venue and the opportunity to secure a transfer later. *Id.*

The specific issue of standing to file a motion before the filing of an Answer or Claim was most recently addressed in *White v. Sabatino,* 415 F. Supp. 2d 1163 (D. Hawaii 2006):

> Plaintiff has moved for Partial Summary Judgment on 3090, Inc.'s Limitation Complaint. 3090, Inc....brought a Limitation Complaint under 46 U.S.C. App. §183(a) ('Limitation of Liability Act' or 'Act')...

> The Act was passed in 1851 'to encourage ship-building and to induce capitalists to invest money in this branch of industry' and to put 'American shipping upon an equality with that of other maritime nations.'...

> ***3090, Inc. argues in its Opposition to Motion 2 that Plaintiff failed to file an F(5) claim and thus lacks standing for Motion 2. The Court disagrees.*** Rule F(5) of the Supplemental Rules for Certain Admiralty and Maritime Claims requires all claimants in a Limitation proceeding to file a claim and answer by the date specified by court order. The purpose of this rule is to consolidate all pending and potential claims against the owner of the vessel in one Limitation proceeding. This allows all claimants and potential claimants to challenge the limitation and share in any awarded damages, which might be limited to the value of the subject vessel.

> The October 3, 2005 Order directed 'all persons asserting claims with respect to the Complaint seeking Limitation...' to file their claims on or before December 12, 2005...***On November 9, 2004, Plaintiff filed a Second Amended Complaint, including 3090, Inc. as a defendant, in civil case No. 04-0500...***On March 7, 2005, Plaintiff filed an Answer to the Limitation Plaintiff's Complaint. On April 15, 2005, Plaintiff's case was consolidated with the Limitation proceeding...***The Court concludes that the Plaintiff's Complaint, Answer and consolidation of the two cases are sufficient to satisfy the aim of Rule F(5)*** and requirements of the Court's October 3, 2005 Order, which itself acknowledged Plaintiff's claim.

> ...Plaintiff's Motion will cause no additional delay to the proceedings nor adversely affect the rights of other parties. The Court is even less persuaded by

the challenge to standing considering the previous lengthy delays endured by
the Court resulting from Limitation Plaintiff's delayed actions in this matter...

Indeed, Wright & Miller, 14A Fed. Prac. & Proc. Juris. §3671 (3d ed. 2010), acknowledges

that the filing of a claim against a Limitation Plaintiff in a separate suit is sufficient to satisfy

Supplemental Rule F(5) - and thus justify standing.

Movants aver that, like in the *White* case, they filed a Complaint including Transocean

as a defendant, and they moved to transfer this matter so that it can be consolidated later in

the appropriate venue with the *Schmalz* litigation. The *Schmalz* Complaint was extremely

detailed and sets out the full set of facts supporting their claims against Transocean,

including Transocean's negligence and the unseaworthiness of the vessel, as well as

Transocean's knowledge of the negligence and unseaworthiness. Under the rationale of

*White, supra,* Movants have satisfied the aim of Rule F(5) by filing a detailed Complaint in

the appropriate venue while preserving their right to object to the venue here.  Thus, Movants

have standing to proceed here to object to the venue and request a transfer.

Moreover, in *Complaint of Marine Sports, Inc.,* 840 F.Supp. 46 (D. Md. 1993), the

court found that a party who had filed a motion for summary judgment but had filed only an

"Answer and Notice of Claim" (but not a Claim), nevertheless had standing to pursue the

motion. Significantly, the *Marine Sports* court continued:

In any event, this Court declines to apply an overly-technical reading to
Supplemental Rule F(5), especially where no prejudice has resulted to
petitioners and in view of the command of the Federal Rules of Civil Procedure
themselves that all pleadings be 'construed as to do substantial justice.'...

In this case, Transocean has not claimed any prejudice by having to address the

Motion to Transfer to the Eastern District of Louisiana now. Claims are not in fact due until

November 15th. Movants aver that it would be a waste of time and judicial resources to delay

4

this case for over four months until claims are filed - particularly when initial matters such as this one could be easily and appropriately addressed. In addition, as discussed below, many of the OPA cases are continuing to proceed, and thus a bifurcated situation where the OPA aspects of the *Deepwater Horizon* litigation continue while the non-OPA claims lie dormant would be untenable. Movants submit they have standing per *White* and their request to transfer should be addressed by the Court now.

II.    **ISSUES THAT SHOULD BE ADDRESSED BEFORE THE DECISION BY THE JPML**

Several Motions to Transfer are pending before the Judicial Panel on Multidistrict Litigation ("JPML"). The JPML has indicated it may not render a decision until late in the summer of 2010, and there is no guarantee that a decision will even be rendered then. But if this case waits until the late summer just to decide the venue where <u>this</u> matter should proceed pending the JPML decision, that would mean that all discovery, responsive pleadings, and motion practice would be delayed even longer than that, and the process will be unnecessarily stagnated. Initial discovery regarding the issue before this Court - the ability of Transocean to claim exoneration or limitation of liability pursuant to the LOLA - can and certainly should proceed, albeit in an appropriate venue.

Furthermore, the *Schmalz* Claimants are hard-working crab fishermen who have families to feed. Their livelihoods continue to be devastated by the unchecked flow of oil into the Gulf of Mexico even to this date. As a practical matter, they cannot wait for years for redress of the wrongs they have suffered. When faced with a similar issue of a 60-90 day delay or more, the court in *Jozwiak v. Stryker Corp.,* 2010 WL 147143 (M.D.Fla. 2010) refused to grant the stay defendants had requested.

Although a request for a stay of this proceeding pending the JPML decision has not

been filed, the request for supplemental briefing implies that a stay is a potential issue for the Court. However, Movants suggest that the U.S. district courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred upon them. *Colorado River Water Conserv'n. Dist. v. U.S.,* 424 U.S. 800, 813, 96 S. Ct. 1236, 47 L. Ed.2d 483 (1976); *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 716, 116 St. Ct. 1712, 135 L.Ed. 2d 1 (1996). A stay is an "*extraordinary* remedy to be granted sparingly where the applicant makes a <u>strong showing of success on the merits and demonstrates an irreparable injury</u>." *Hamzey v. Bayer Corp.,* 2010 WL 2011529 (S.D. Cal. 2010), citing *Hilton v. Braunskill,* 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987).

Transocean has made no showing of success on the merits *at all*. Certainly, Transocean did not demonstrate -or even attempt to demonstrate - irreparable harm if a stay is not rendered herein. Therefore, Movants suggest that a stay is not appropriate here pending the JPML action, and that this Court should proceed with the matter before it, namely the requested transfer.

In addition, Rule 1.5 of the Federal Rules of Procedure of the Judicial Panel on Multidistrict Litigation provides that the pendency of a motion to transfer to the JPML "does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court." Similarly, the MANUAL FOR COMPLEX LITIGATION, Federal Judicial Center, §20.131 and §22.35 (4th ed. 2004) states that the district courts retain jurisdiction over the case and need not suspend the matters pending a motion for JPML transfer.  It further suggests that the district court should not "automatically postpone rulings on pending motions or generally suspend further proceedings." Many courts will refuse a stay of all proceedings on this basis. *See, e.g., Wells*

*v. Toyota Motor Sales USA, Inc.,* 2010 WL 1856012 (S.D. Ill. 5/7/10).

Many cases in other district courts are continuing to proceed. Since the filing of the initial Complaint herein and Transocean's "Motion To Strike Movants' Motions to Transfer Venue/Dismiss" [**Rec. Doc. 52**], Transocean has now admitted that the limitation of liability provided by 46 U.S.C. 30501, *et seq.* (the "LOLA") does not apply to claims made pursuant to the Oil Pollution Act, 33 U.S.C. §2701, *et seq.* ("OPA"), as the OPA preempts maritime law.[2] [**Rec. Doc. 59**] Thus, many of the cases involving OPA claims will continue to progress.

The question that should be considered by this Court is whether the claims of many Claimants should be bifurcated, whereby half (the OPA claims) proceed where they were filed, and (if this matter is stayed pending the JPML decision) half remain stagnated here, albeit arising out of the same incident. The *Schmalz* Claimants suggest that in order to further the interests of judicial economy and to avoid inconsistent judgments, a stay pending the JPML decision months from now should not be granted; rather, the request for a transfer should be addressed now and this matter should be transferred to the Eastern District of Louisiana to allow this matter to go forward as one complete and congruent suit there.

For example, when faced with Motions to Stay filed by BP, PLC ("BP") and Halliburton Energy Services, Inc. ("HESI"), the uniform response by the U.S. District Courts for the State of Alabama has been to deny those motions and to refuse to stay any proceedings pending the JPML decision on the question of transfer. In *Hopkins v. Transocean, Ltd.,* 2010 WL 2104548 (S.D. Ala. 5/25/10), one of six Alabama decisions rendered by Judge William H. Steele of the Southern District of Alabama, Judge Steele found:

_____

[2] In article 20 of the Complaint filed in this case, Transocean originally sought exoneration from and/or limitation of liability for any claims, including those asserted under OPA. [**Rec. Doc. 1,** p. 7.]

7

In this case, the Court finds that the Motion to Stay is premature. As noted, the MDL panel will take up the motions to transfer in MDL No. 2179, approximately 60 days from now. ***There is no reason why this action cannot move forward with preliminary steps in the interim.*** Regardless of whether and where the MDL panel ultimately transfers this action for consolidated and coordinated pretrial proceedings, defendants will need to file answers or responsive pleadings. Should any of those defendants see fit to file Rule 12(b)(6) motions, those motions will need to be briefed. Entering a stay at this juncture and under these circumstances would not rescue defendants from material hardship or the risk of inconsistent adjudications; after all, they must answer the Complaint anyway, and the likelihood of adjudication of any merits issues prior to late July (when the MDL Panel will hear the motions to transfer) appears quite slim, simply because of the nascent status of this litigation. By all appearances, ***the only tangible effect of entering a stay at this time would be to allow defendants a three-month reprieve after service of process before being required to answer*** the allegations brought by plaintiffs in the Complaint. ***Such a protracted delay appears both unnecessary and unwarranted. By contrast, it would benefit both the parties and the transferee court (assuming there is one) to have a clear picture of the issues joined and the defenses raised, with briefing of any threshold legal issues already completed, at the time of any transfer order by the MDL Panel.***

Similar decisions were rendered by Judge Steele in *Billy's Seafood, Inc. v. Transocean Holdings, Inc.,* 2010 WL 2104610 (S.D. Ala. 5/25/10), *Trahan v. BP, PLC,* 2010 WL 2104613 (S.D. Ala. 5/25/10), *Fishburn v. BP, PLC,* 2010 WL 2104624 (S.D. Ala. 5/25/10), *Paul v. BP, PLC,* 2010 WL 2104626 (S.D. Ala. 5/25/10), and *Marine Horizons v. BP, PLC,* 2010 WL 2104629 (S.D. Ala. 5/25/10). Judge Steele noted that as of May 25th, despite literally dozens of putative class actions filed in at least seven federal district courts (in addition to state court actions), not a single answer or Rule 12(b)(6) Motion to Dismiss had been filed. And as Judge Steele pointed out, the only tangible effect of granting a stay would be to allow the defendants an unwarranted three-month reprieve after service of process while the case lies dormant unnecessarily.

In addition, Judge Kristi K. DuBose, also of the Southern District of Alabama, Southern Division, denied the joint motions of BP and HESI for stays of at least five other

proceedings, granting the defendants leave to re-file only after responsive pleadings were filed, obviously encouraging the parties to proceed with the litigation. *See, Burke v. BP Corp. North America, Inc.,* USDC-SDAL no. 10-cv-0195 (S.D. Ala. 5/25/10); *Drawdy, et al v. Transocean, Ltd., et al,* USDC-SDAL no. 10-cv-0235; *Fishtrap Charters, LLC, et al v. Transocean Holdings, Inc., et al,* USDC-SDAL no. 10-cv-0202; *Original Oyster House, Inc., et al v. Transocean, Ltd, et al,* USDC-SDAL no. 10-cv-0223; and *Wilkerson, et al v. Transocean Holdings, Inc., et al,* USDC-SDAL no. 10-cv-0201.

Although BP has in other cases pointed to several stays which have been granted, in most of those cases, the motions for stay were <u>unopposed</u>. *See, e.g., Schouest, et al v. BP Products North America, Inc., et al,* USDC-WDLA no. 10-727; *Ward, et al v. BP, PLC, et al,* USDC-NDFL no.4:10-cv-157; *Douglass, et al v. Transocean Holdings, Inc,et al,* USDC-NDFL no.3:10-cv-136; *Water St. Seafood, Inc, et al v. BP, PLC, et al,* USDC-NDFL no.4:10-cv-162.

It is hoped that when Judge Barbier hears the issue of a stay pending the JPML's decision in the *Schmalz* case[3] and the other cases before him on June 4th, he will follow the lead of all of the Alabama courts to date.  If the OPA claims will continue to proceed in the various district courts, this matter should not be stayed pending the JPML decision while they progress. Moreover, the issue of whether this case should be transferred to the Eastern District of Louisiana to allow it to proceed as one suit should be immediately addressed.

As previously argued, in addressing a transfer proposed pursuant to Rule F(9), the court should consider the same *forum non conveniens* factors that are used to determine the appropriateness of transfers under 28 U.S.C. §1404. *Matter of TLC Marine Svcs., Inc.,* 900

---

[3] *See,* USDC-EDLA, no. 2:10-cv-1452, Rec. Doc. 7 and 7-3.

F. Supp. 54, 56 (E.D. Tex. 1995)  Under the doctrine of *forum non conveniens,* a court may dismiss an action in favor of an alternative forum when "the chosen forum would establish..oppressiveness and vexation to a defendant...out of proportion to plaintiff's convenience, or when the chosen forum [is] inappropriate because of considerations affecting the court's own administration and legal problems." *American Dredging Co. V. Miller,* 510 U.S. 443, 447-448, 114 St. Ct. 981 (1994). Granting a motion to dismiss for *forum non conveniens* rests in the discretion of the district court based on several factors, including: (1) ease of access to sources of proof; (2) the availability of compulsory process for securing the attendance of unwilling witnesses; (3) the costs of obtaining the attendance of witnesses; (4) the ability to view premises; (5) the general facility and cost of trying the case in the selected forum; and (6) the public interest, including administrative difficulties, the local interest of having localized controversies decided at home, and the interest of trying cases where the substantive law applies. *Id.,* 510 U.S. at 448; 114 S. Ct 981.

Indeed, the majority of the witnesses needed to establish the cause of the loss and the negligence and/or unseaworthiness of the vessel are located in Louisiana.  Specifically, MMS personnel, the Coast Guard, and many of the workers aboard the *Deepwater Horizon* reside within the Eastern District of Louisiana. In addition, many persons who participated in the subsequent investigation and clean-up efforts, as well as all of the Schmalz Claimants, are located in Louisiana. Compulsory process for securing the attendance of unwilling MMS, Coast Guard, and non-party vessel personnel exists there as well. Because more non-party witnesses are available in Louisiana, rather than in Houston, the costs in general, including the cost of obtaining the witnesses' attendance, and their inconvenience would be less if the matter proceeds there. "The location of nonparty fact witnesses is the primary consideration

in assessing this factor." *Houston Trial Reports, Inc. v. LRP Publ'ns, Inc.,* 85 F. Supp. 2d 663 (S.D. Tex. 1999). Although some of Transocean's employees reside in Houston, Transocean controls its employees and can compel their appearance.

Obviously, there is a huge public interest in trying the matter in Louisiana because of the significant damage to Louisiana's coastline, wildlife, and seafood industry. Houston has not been as adversely impacted by this oil spill.  In addition, the "Supreme Court has determined that '[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.'" *In re Volkswagon AG,* 371 F. 3d 201, 206 (5th Cir. 2004), citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09, 67 s. Ct. 839, 91 L.Ed. 1055 (1947). Clearly, the citizens of the State of Louisiana and the State itself have been most detrimentally impacted and the public interest in this matter is greatest there.

The *Schmalz* litigation also includes several pendant state-law claims, and Louisiana would have an interest in trying these cases where the substantive law of Louisiana applies. Further, the ability to view the premises affected exists off Louisiana's coast.

Finally, to the extent that the first action filed was filed in the Eastern District of Louisiana, that should be an additional factor supporting the transfer of this matter. *See, e.g., Carter v. Nicholson,* 2007 WL 3316086 (5th Cir. (Tex.) 2007), citing *Save Power, Ltd. v. Syntek Fin. Corp.,* 121 F. 3d 947, 950 (5th Cir. (Tex.) 1997). And, as has been previously pointed out in other briefs, although Transocean asserts that lawsuits have been filed in the Northern District of Louisiana, *there is no "Northern District of Louisiana."*

Although Transocean argues that the Southern District of Texas is and was an appropriate forum pursuant to F.R.C.P. Supp. F(9), that does not preclude a transfer based

on the *forum non conveniens* factors listed above.

**III.    WHETHER THE INJUNCTION ORDER ISSUED HEREIN SHOULD BE MODIFIED**

This Court also asked for supplemental briefing on whether and in what way the

Court's current injunction order should be modified. Transocean's original Complaint, article

20, claimed exoneration and/or limitation of liability even as to OPA claims.

However, as previously stated, since the filing of the initial Complaint and

Transocean's "Motion To Strike Movants' Motions to Transfer Venue/Dismiss", and since this

Court's Minute Entry requesting additional briefing, Transocean has admitted that this

Limitation action did not in fact apply to the OPA claims. Transocean's admission has

already resulted in the rendition of a First Amended Order Directing Claimants to File and

Make Proof of Claims exempting OPA claims.[**Doc. 61**] However, even as to those claims

not covered by OPA, Transocean cannot carry the burden of proof necessary to effectuate a

limitation on its liability under LOLA, given the testimony of its own personnel. Thus, the

Schmalz Claimants aver that this entire LOLA action must be dismissed.

**IV.    WHETHER THIS LIMITATION ACTION SHOULD BE DISMISSED ENTIRELY**

**A.    OPA Repealed the Limitation of Liability Act as to Oil Spill Claims**

OPA was passed by Congress in response to the disastrous oil spill involving the

supertanker, *Exxon Valdez*, in Prince William Sound, Alaska in 1989. *Bean Dredging, LLC v.*

*U.S.,* 2010 WL 1189903 (D.D.C. 3/30/10). OPA imposes strict liability on the "responsible

party" for pollution removal costs and damages from the discharge of oil into U.S. navigable

waters. 33 U.S.C. §2701(a). OPA also provides for the Oil Spill Liability Trust Fund for the

payment of claims (33 U.S.C.§2712(a)), and it limits the liability of "responsible parties"

based on the type of the vessel, subject to certain exceptions. 33 U.S.C. §2704. In the case

12

of an offshore facility (other than a deepwater port), liability is limited under OPA to the total of all removal costs plus $75 million. 33 U.S.C. §2704(a)(4).[4]  However, the exceptions to the limitation of liability include:(1) gross negligence or willful misconduct of the "responsible party"(33 U.S.C. §2704(c)(1)); (2) the responsible party's violation of applicable Federal safety, construction and/or operating regulations; *Id.*, and (3) failure of the "responsible party" to provide "all reasonable cooperation and assistance requested by a responsible official in connection with removal activities..." (33 U.S.C. §2704(c)(2)(B)). Where an exception exists, the liability of the "responsible party" is virtually unlimited.

In deciding whether this Limitation Action should be dismissed, the answer is clearly yes as to the OPA claims. While Transocean has agreed to modify the Limitation Injunction to exclude OPA claims [**Rec. Doc. 59**], it has <u>not</u> yet amended its Complaint to delete the allegation that it is entitled to exoneration or limitation of liability as to <u>all</u> claims, including those brought under OPA.  [**Rec. Doc. 59**, p. 7, art. 20]

Nevertheless, Movants aver the Court should consider the following portions of OPA's legislative history in determining that this action should be dismissed, not merely the injunction modified, as to all OPA claims:

> It is important to note that following enactment of this Act, liability and compensation for petroleum oil pollution damages caused by a discharge from a vessel or facility will be determined in accordance with this Act. H.R. Conf. Rpt., p. 802.

> Liability under this Act is established notwithstanding any other provision or rule of the law. This means that the liability provisions of this Act would govern limitations compensation for removal costs and damages <u>notwithstanding any</u>

---

[4]The Regulations were to be adjusted to reflect consumer price index changes no later than July 11, 2009, but it is not clear that this adjustment was made.  33 U.S.C. §2704(d)(4).

<u>limitations under existing statutes such as the act of March 3, 1851</u>...H.R. Conf. Rpt. No. 101-653, at 103 (1990), reprinted in 1990 U.S.C.C.A.N. 779, 781.

***[OPA] completely supersedes the 1851 statute with respect to oil pollution.*** S. Rep. No. 101-94, at 14, reprinted in 1990 U.S.C.C.A.N. 722, 736.

*In re: Metlife Capital Corp.,* 132 F.3d 818 (1st Cir.1997), involved an OPA claim filed by the Commonwealth of Puerto Rico for damages after a barge ran aground and an oil spill ensued. The operator and owner of the tug filed a Limitation of Shipowner's Liability Act Complaint, seeking exoneration from or limitation of liability. The court in *Metlife* held:

> The OPA specifically addresses its relationship with the Limitation Act and other legislation when it states:
>
>> Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged...is liable for the removal costs and damages specified in subsection (b) that result from such incident...
>
> However, ***a plain reading of the subsection suggests that the OPA repealed the Limitation Act with respect to removal cost and damages claims against responsible parties***....
>
> In addition to the 'notwithstanding' clause, at least four other provisions in the statute explicitly repeal the Limitation Act with respect to certain types of claims. *See* 33 U.S.C. §§ 2702(d)(1)(A) (repealing the Limitation Act as to third parties solely responsible for a spill); 2718(a) (repealing the Limitation Act as to state and local statutory remedies); 2718( c )(1) (repealing the Limitation Act as to additional liability imposed by the United States, any state, or political subdivision); 2718( c )(2)(repealing the Limitation Act as to fines or penalties)...
>
> When we consider these five OPA provisions which explicitly repeal the Limitation Act as well as others that are irreconcilably in conflict, *see infra,* we find that ***the OPA has repealed the Limitation Act as to oil spill pollution claims arising under the OPA*** in the instant case. ***"[W]here provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."***...
>
> While the repeal of statutes by implication is disfavored...several key provisions of the two statutes are plainly inconsistent. First, the Limitation Act limits the shipowner's liability to the post-accident value of the vessel plus pending

freight, 46 U.S.C. App. §183, while...in certain instances, the OPA imposes virtually unlimited liability on the responsible party...

More generally, as the Ninth Circuit reasoned in finding an implicit repeal of the Limitation Act by the liability provisions of the Trans-Alaska Pipeline Authorization Act, 43 U.S.C. §§1651-1655, '[a]pplication of the Limitation Act to [the OPA] would frustrate completely [the OPA]'s comprehensive remedial nature.' *See In re Glacier Bay,* 944 F. 2d 577, 583 (9th Cir. 1991).***'The purpose of OPA, as well as other remedial legislation passed by Congress and the states to address environmental disasters such as oil spills, was to encourage rapid private party responses.'...However, the Limitation Act 'allows vessel owners virtually to eliminate liability for catastrophic damages.'...Hence, the OPA's scheme is in irreconcilable conflict with the Limitation Act...***

Thus, this Limitation Action *must* be dismissed entirely as it relates to all OPA claims, given that Transocean has not agreed to amend the allegations in article 20 of its Limitation Complaint which seek to limit Transocean's liability even as to the OPA claims.

However, the Schmalz and/or other Claimants' remaining claims may be subject to the Limitation Action. For example, OPA permits states to impose additional liability over and above that imposed by the OPA statute. *Van Schaeffer v. Tsakos Shipping and Trading, S.A.,* 2006 WL 1192939 (E.D. Pa. 5/2/06); *Complaint of Harbor Towing Corp.,* 335 F. Supp. 1150 (D. Md. 1971).  For this reason, Movants will discuss whether this matter should be dismissed as to the non-OPA claims, due to Transocean's inability to carry its burden of proof under the LOLA.

**B.   Transocean Cannot Carry Its Burden of Proof To Limit Its Liability**

While clearly this matter should be dismissed as to the OPA claims, the issue remaining is whether the Limitation Action should be dismissed entirely, presumably even as to non-OPA claims. The *Schmalz* Claimants aver that Transocean cannot carry the burden imposed on it to secure a limitation of its liability as to any non-OPA claims.

15

46 U.S.C. § 30505 (b) provides:

**(b)** **Claims subject to limitation.** Unless otherwise excluded by law, ***claims, debts, and liabilities subject to limitation*** under subsection (a) ***are those arising from*** any embezzlement, loss or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or by ***any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner....***

Movants assert that their claims for economic damage to their livelihoods are unrelated to goods or merchandise aboard the vessel. Their losses are also unrelated to a collision. And significantly for the Court's purposes here, Transocean was privy to and had knowledge and/or constructive knowledge of the Deepwater Horizon's unseaworthiness, such as the condition of its Blowout Preventer ("BOP") which caused it to fail and ultimately the Deepwater Horizon to explode and sink. Movants also aver that Transocean was privy to and had knowledge or constructive knowledge of negligence that caused the vessel to explode and sink, including but not limited to: (1) premature extraction of mud; (2) tampering with the BOP; (3) problems with the BOP including but not limited to its ability to function at this depth, its leaking hydraulic lines, and its non-functional battery for the control panel; and (4) failure to heed negative pressure tests by continuing operations without doing more extensive and conclusive testing.  These conditions, and Transocean's knowledge of them, are specifically pled and are an integral part of the Complaint in the <u>Schmalz</u> litigation.

The limitation of liability provided by 46 U.S.C..§30501 *et seq.,* is only available if Transocean can establish its complete lack of knowledge of the negligence and unseaworthiness that caused the loss and that Transocean availed itself of <u>all means of knowledge reasonably necessary to prevent the conditions likely to cause loss</u>. *In re Mission*

16

*Bay Jet Sports, LLC,* 2010 WL 1909531 (S.D. Cal. 5/10/10). <u>This Transocean cannot do</u>.

1.    <u>Transocean Knew or Should Have Known of the Vessel's Unseaworthiness</u>

Transocean knew or should have known of the *Deepwater Horizon's* unseaworthiness due to problems with its BOP, yet Transocean failed to correct those problems, as established in sworn testimony during the Congressional and Coast Guard hearings. For example, Jimmy Harrell, Transocean's Offshore Installation Manager (the top-ranked drilling official on the *Deepwater Horizon*), testified at the hearings held by the U.S. Coast Guard and Minerals Management Service on Thursday, May 27th. He admitted a "tick" on the BOP's test ram when it was in the open position, but he ignored it. This was negligence and constructive knowledge of the *Deepwater Horizon's* unseaworthiness that will exclude any limitation of liability.

Furthermore, Chris Pleasant, Transocean's subsea supervisor and the person in charge of the BOP, testified that he hit the emergency disconnect system's button which should have activated the BOP's shear rams. Mr. Pleasant testified that although the system went through the sequence at the panel, the signal to disconnect did not travel from the panel to the BOP because it  "had no hydraulics." This manifested a condition of unseaworthiness of the vessel which would deprive Transocean of any limitation of liability, caused by inadequate maintenance by Transocean.

In addition, the BOP's shear ram was not strong enough to shear through pipe joints that connected the sections of drill pipe and covered 10% of the pipe's length, according to communications by Cameron International Corporation to Congressional staff. If the BOP could not cut through the joint sections of the pipe it was inherently useless if the kill switch

was hit when a joint was aligned with the ram shear. This fundamental inability of the BOP to operate roughly 10% of the time manifested another condition of unseaworthiness of this vessel which would deprive Transocean of a limitation of its liability.

Finally, there was a safety device on the *Deepwater Horizon's* air-intake system that should have prevented the flow of gas into the engine control room. That device also did not function properly, again evidence of the *Deepwater Horizon's* unseaworthiness.

2.   Transocean Knew or Should Have Known of the Negligence

Mr. Harrell admitted that two negative pressure tests were performed on April 20th. Had the rig been operating properly, both tests should have disclosed that no drilling mud was being returned to the rig.[5]  Harrell acknowledged that the first test returned 23 barrels of mud and the second test returned 15 barrels of mud. He stated he was nevertheless "happy" with the results, so he allowed the displacement of mud with seawater to begin.

Despite Mr. Harrell's professed satisfaction with the negative pressure test results, the testimony of Transocean subsea supervisor, Chris Pleasant, established that in fact there were lengthy discussions about fluid losses during the negative pressure testing, and that BP's top official on the rig, Robert Kaluza,[6] knew that according to the "APD" (the rig's permit to drill), the appropriate results to continue operations were not achieved. Harrell's testimony also conflicts with that of Christopher Haire, a Halliburton cementer. In any event, however, Transocean knew of and was responsible for negligence that led to the explosion and sinking

---

[5]In a negative pressure test, the well is shut off using the BOP's annular valves. The test is used to measure if pressure from the well causes mud to come up the riser.

[6] Mr. Kaluza has invoked his Fifth Amendment privilege against self-incrimination to avoid testifying at the Coast Guard/MMS hearings.

18

of the rig when it learned of the poor test results but failed to stop operations. Transocean has now admitted in sworn testimony that it knew of the adverse test results and continued anyway. This will deprive Transocean of a limitation of liability.

In addition, Mr. Harrell further testified that because he was "happy" with the results of the two negative pressure tests (which returned a total of 38 barrels of mud instead of zero), he did not perform a test known as a "cement bond log", a definitive but very costly test of the integrity of the well's cement required by federal regulations in the face of questionable results from negative pressure tests. The Schlumberger team brought to the well by BP was sent home at 11 a.m. on April 20, 2010, having never performed the test. Once again, Transocean has admitted in sworn testimony that it had knowledge of the adverse tests and it continued operations without doing more extensive testing; thus Transocean is responsible for negligent acts that ultimately led to the explosions, the sinking of the rig, and the oil spill and which deprive it of the protections of the LOLA.

Harrell also testified that he knew BP had decided not to conduct a "bottoms-up" test (a test which samples drilling mud from the deepest part of the well to measure pressures and temperatures). Mr. Harrell testified he was not concerned about the failure to conduct the "bottoms up" test. Again, Transocean has admitted that it knew of test results which mandated further testing, but it continued without conducting the further tests. Thus, it was responsible for negligence that led to the sinking of the rig and the oil spill and its sworn testimony will deprive it of any limitation of liability.

Finally, Harrell also testified that he was preoccupied hosting high-level BP officials in the hours before the explosion. Thus, his attention was not fully focused on the rig and the

operations being conducted. Again, his negligence led to the explosions and the oil spill.

The *Deepwater Horizon* may have also been unseaworthy insofar as its equipment that should have allowed the rig to disengage from the well did not function.

The Schmalz Claimants aver that even as to the non-OPA claims, Transocean cannot carry its burden of proof to secure a limitation of liability, based on the sworn testimony already elicited from its employees. As a result, this matter must be dismissed in its entirety.

RESPECTFULLY SUBMITTED:

**MOTION FOR PRO HAC VICE ADMISSION PENDING**

_____/s/ Karen D. McCarthy_____
LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
ZATZKIS McCARTHY & ASSOCIATES
650 Poydras Street, Suite 2750
New Orleans, Louisiana 70130
Telephone:  (504) 523-2266
Facsimile: (504) 523-2266
ATTORNEYS FOR CHARLES SCHMALZ, *et al*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 1st day of June, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send notice of electronic filing to all counsel of record.

___/s/ Karen D. McCarthy_____