IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, TRANSOCEAN HOLDINGS LLC, TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC., AND TRANSOCEAN DEEPWATER INC., AS OWNER, MANAGING OWNERS, OWNERS PRO-HAC VICE, AND/OR OPERATORS OF THE MODU DEEPWATER HORIZON, IN A CAUSE FOR EXONERATION FROM OR LIMITATION OF LIABILITY | C.A. No. 4:10-CV-01721<br>In Admiralty |

## MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO TEST EQUIPMENT

### Introduction

On April 20, 2010, a fire and explosions occurred on board the *Deepwater Horizon*, a marine vessel that was at material times conducting drilling operations in the Gulf of Mexico. The vessel eventually sank. The cause of this incident is currently under investigation by private parties and by various governmental agencies.

Petitioners Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling Inc. and Transocean Deepwater Inc. ("Petitioners") seek permission to test two pieces of equipment – solenoids – that were recently removed from a control module of the blowout preventer. Based upon information provided to Petitioners, the solenoids may have begun to deteriorate. Unless they are tested soon, the opportunity for meaningful testing could be jeopardized.

## Background

Petitioners owned and operated a marine vessel named the *Deepwater Horizon.* On April 20, 2010, a "blowout" – a sudden, unexpected release of pressure from within the well – occurred. A blowout preventer ("BOP") sitting on top of the well was unable to stop the flow.

More than 140 lawsuits related to the incident have been filed against Petitioners, including claims for wrongful death, personal injury, business interruption and environmental damages and shareholder derivative claims. On May 13, 2010, Petitioners filed a Limitation of Liability Action, and the Court entered an Order and Amended Orders staying certain lawsuits against Petitioners related to the incident. (Dkt. #9 at 3; Dkt. #61 at 4; Dkt. #131 at 4) The Second Amended Order further requires that all claimants subject to this stay file their claims in this exoneration and limitation proceeding. (Dkt. #131 at 4) In other lawsuits that have been filed, Protective Orders have been entered by the various courts.

Several investigations of the causes and effects of the incident are ongoing, including investigations by the U.S. Minerals Management Service ("MMS"), the U.S. Coast Guard and several committees and subcommittees of the House and the Senate. Among other things, these investigations are examining the functioning of the BOP and its operation under the attendant circumstances. In the event of a blowout, a BOP is designed to shut off the flow of oil or natural gas under certain circumstances by squeezing, crushing or shearing certain types of pipes. (Florence Decl. ¶ 3) (Ex. 1) The "brains" of a BOP are control modules known as "pods," which sit on top of the BOP. (*Id.*) These pods rely on a variety of component parts, including solenoids, which send electromagnetic signals to the hydraulics to operate the rams to squeeze, crush or shear the pipes. (*Id.*)

After the incident, one of the yellow pods was removed from the BOP, which, on information and belief, Cameron International Corporation ("Cameron") manufactured. With the concurrence of the U.S. Coast Guard, MMS and under their supervision, Cameron removed two solenoids from the yellow pod. These solenoids are now in Petitioners' possession.[1]

## The Proposed Testing

Petitioners seek to test the two solenoids, which testing, on information and belief, would serve these proceedings, as well as the Congressional and investigative agencies, by advancing the parties' and the public's understanding of the circumstances surrounding the incident.

Time, apparently, may be of the essence in completing the testing. The atmospheric environment, based upon what Petitioners have been apprised, is potentially causing the solenoids to accumulate bacteria and become contaminated. (Florence Decl. ¶ 8) As the amount of bacteria and contamination increases, the ability to test the solenoids meaningfully and recreate the conditions under which they are operating may be decreasing. (*Id.*) Thus, unless these solenoids are tested soon, meaningful testing may never be possible. (*Id.*)

Petitioners' proposed testing would consist of two stages, both of which would be performed by Stress Engineering Services, Inc. The first stage would simulate the water-depth conditions, including temperature and pressure, under which the solenoids were operating. The test would measure the hydraulics, the continuity, and the resistance of the solenoids as well as their performance when fully powered. A step-by-step description of this stage of testing is contained in the attached Declaration. (*Id.* ¶ 6) The second stage would mimic the standard

---

[1] Pursuant to this Court's Memorandum and Order dated June 23, 2010, (Dkt. #150), Petitioners are in the process of complying with the June 16, 2010 Subpoena of the Marine Board of Investigation that requires Petitioners to deliver to the United States Coast Guard a 50-foot section of riser cut from the top of the *Deepwater Horizon* BOP and all recovered *Deepwater Horizon* debris. *Id.* at 1. The solenoids do not fall within the terms of the June 16, 2010 Subpoena as "debris." Nevertheless, Petitioners intend to cooperate fully with the Marine Board of Investigation with respect to service of, and Petitioners' response to, any future subpoena issued by the Marine Board of Investigation to deliver to the United States Coast Guard the two solenoids at issue.

quality-control testing that Cameron performs to ensure that a solenoid is assembled properly and is free of manufacturing defects before its distribution and sale. (*Id.* ¶ 7) The step-by-step description of this second stage of testing, entitled "Assembly and Test Procedure for Cameron Solenoid Valves," contains information that Cameron claims to be confidential and proprietary. As a consequence, this description is being filed under seal as Exhibit 2 to this Memorandum for the Court's *in camera* review. (Ex. 2) Petitioners will make Exhibit 2 available to interested parties upon the entry of an appropriate protective order that preserves the confidentiality of the information contained in Exhibit 2 and limits that information's use to litigation arising out of the incident that is the subject of this limitation proceeding.

Upon information and belief, the proposed testing would not destroy the solenoids (they would still be available for later inspections), but it may alter their physical state. For example, in performing the testing's second stage, the tester may need to switch out component parts of the solenoids.

All stages of the testing would be fully recorded by video, as well as by audio, so that all interested parties could observe and evaluate the tests. Petitioners have notified all claimants in this limitation proceeding of the proposed testing by providing a copy of the Motion for Leave to Test Equipment and this Memorandum. Petitioners ask that the Court grant this Motion for Leave to Test Equipment and enter an order allowing the proposed testing to proceed, under which circumstances Petitioners would give notice of the testing's time and place to (1) all claimants in this limitation proceeding, (2) MMS, the Coast Guard and the Department of Justice, and (3) the Congressional committees and subcommittees that are conducting investigations. Representatives of interested parties would be invited and allowed to observe the testing under circumstances that would not interfere with the testing.

## Argument and Authorities

### I.  Applicable Standard

Courts differ over whether motions for leave to test tangible things fall under Federal Rule of Civil Procedure 34 or 26(c). "Whether the motion is made under Rule 34 or Rule 26, however, the applicable standard for considering [the] proposed testing remains the same." *Mirchandani v. Home Depot, U.S.A., Inc.*, 235 F.R.D. 611, 613 (D. Md. 2006) (granting motion to conduct inspection and destructive testing of allegedly defective ladder). "When the proposed test will alter the original state of the object, the court must balance the costs of the alteration of the object and the benefits of getting to the truth in the case." *Nugent v. Hercules Offshore Corp.*, No. Civ. A. 98-3060, 1999 WL 1277536, at *1 (E.D. La. Dec. 28, 1999) (affirming order granting motion to conduct destructive testing of failed lanyard). In doing so, a court should consider four factors:

1. Whether the proposed testing is reasonable, necessary and relevant to the proceeding;

2. Whether the nonmovant's ability to present evidence at trial will be hindered, or whether the nonmovant will be prejudiced in some other way;

3. Whether there are any less prejudicial alternate means of obtaining the evidence sought; and

4. Whether there are adequate safeguards to minimize the prejudice to the nonmovant, particularly the nonmovant's ability to present evidence at trial.

*Mirchandani*, 235 F.R.D. at 613.

These four factors support the propriety – indeed, the necessity – of promptly testing the solenoids. "The administration of justice profits by the progress of science." *Petruk v. S. Ferry Realty Co.*, 2 A.D.2d 533, 536-37 (N.Y. App. Div. 1956) (permitting destructive testing of allegedly defective bolt); *see also Mirchandani*, 235 F.R.D. at 613 (noting that the "standard for

evaluating requests to perform destructive testing appears to have initially been developed in *Petruk*"). "Resort should be had to scientific tests whenever the results disclosed by the tests can aid or elucidate the just determination of legal controversies." *Petruk*, 2 A.D.2d at 536-37. The Court therefore should permit the proposed testing.

### II. The Proposed Testing Is Reasonable, Necessary and Relevant.

Testing is reasonable, necessary and potentially relevant when it is "integral" to a proceeding. *See Mirchandani*, 235 F.R.D. at 615. In this proceeding, the determination of liability is at issue. *See, e.g., In re Dammers & Vanderheide & Scheepvaart Maats Christina B.V.*, 836 F.2d 750, 755 (2d Cir. 1988) (describing the principal issues in limitations proceedings). Resolving that issue will require this Court to find the cause or causes of the incident, and the BOP could be part of that inquiry. Thus, promptly testing the BOP's solenoids to try to determine their functionality is reasonable, necessary and relevant to this proceeding. *See Petruk*, 2 A.D.2d at 537 ("The narrowing down of areas of dispute by scientific means aids in the administration of justice."). Given the solenoids' continued potential deterioration, neither Petitioners nor other interested parties may ever again have the chance to assess their functionality.

### III. The Proposed Testing Will Not Prejudice Any Party.

In analyzing the second factor – whether the proposed testing would cause prejudice – courts typically focus on whether a party intends to use the object "in its original state at trial." *Mirchandani*, 235 F.R.D. at 615-16 (collecting cases) (internal quotation marks omitted). Some "material change in the appearance of the object, even when [a party] plans to present the object at trial, is insufficient to categorically prohibit" testing. *Id.* at 616. Rather, the question is "whether the deprivation of the ability to make a live presentation to the jury – as opposed to just

showing the jury a videotaped presentation – is enough to outweigh" the testing's benefits. *Id.* (permitting testing where the parties could show a videotape of the object, which would survive the testing "with all but one of its original parts").

Here, the proposed testing of the solenoids will not likely prejudice any party. The ability to exhibit the solenoids in their original, unaltered state would provide virtually no value to the parties. As one court aptly explained in permitting the testing of a chain link, "it is beyond a layperson's knowledge to determine just by looking at a chain link whether the link is defective, *i.e.* it takes scientific, technical, or other specialized knowledge to explain why a chain link might break." *White v. Cooper Tools, Inc.*, No. Civ. 06-4272, 2010 WL 1418244, *3 (D.S.D. April 6, 2010) (holding that the ability of the party opposing testing "to present evidence at trial [would] not be unreasonably hindered"). Likewise, a lay person could not look at the solenoids and determine whether they are working properly; expert testimony based on the proposed testing is required to explain that.

In fact, the parties may suffer more prejudice from a delay in the proposed testing than they would from any ability to present the solenoids at trial in their original state. In the event that a delay may cause the solenoids to deteriorate, or to deteriorate further, to the point that meaningful testing is not possible, all parties could be prejudiced. The chance to examine whether the solenoids work properly may have passed under these circumstances. (Florence Decl. ¶ 8, Ex. 1) This second factor, therefore, also favors the proposed testing.

### IV. There Are No Less Prejudicial Alternate Means of Determining Whether the Solenoids Work Properly.

"There do not appear to be any [decisions regarding testing] that have turned on the validity of alternative non-destructive methods of obtaining the evidence sought." *Mirchandani*, 235 F.R.D. at 616. "It is apparent, however, that this [third factor] encourages the party

opposing destructive testing to suggest less destructive and less prejudicial counter-proposals...." *Id.*

Here, there are no less prejudicial alternatives to Petitioners' proposed testing. For the solenoids to provide any insight into the incident, prompt testing should occur. (Florence Decl. ¶ 8, Ex. 1) Otherwise, their continued deterioration may foreclose the chance to test whether they are working properly. (*Id.*) In addition, the proposed testing is minimally invasive. The testing's second stage – the more exacting of the two – would subject the solenoids to no more stress than they would have endured during Cameron's presale, quality-control process. (*Id.* ¶ 7) Thus, this third factor favors the proposed testing.

## V. There Are Adequate Safeguards to Minimize Any Potential for Prejudice.

"The final inquiry of the four-pronged test involves consideration of the safeguards that may be put in place to minimize the potential for prejudice to non-movants." *Mirchandani*, 235 F.R.D. at 616-17. Adequate safeguards include (1) notice of the testing, (2) video and audio recording of the test and (3) the ability to obtain the test results. *Id.* at 617 (summarizing cases). All three of those safeguards would be in place here. Petitioners have given notice of the proposed testing to all claimants in this limitation proceeding. Other interested parties, as explained above, will be notified of the testing if this motion is granted. Petitioners will invite representatives of interested parties to attend and observe the testing. Petitioners will also record both stages of the testing by audio and video, and that recording will be available to the parties. In light of the number of interested parties and the narrow window for testing the solenoids before they deteriorate into an unusable state, these safeguards are adequate to minimize any potential for prejudice. As with the first three factors, therefore, this final factor weighs in favor of Petitioners' proposed testing.

## Conclusion

For the foregoing reasons, Petitioners respectfully request an order of this Court granting Petitioners permission to test the solenoids in accordance with the procedures described in Exhibit 1 to this Memorandum.

Respectfully submitted,

By: /s/ Frank A. Piccolo

Frank A. Piccolo
TBN: 24031227
SDBN: 30197
Fpiccolo@preisroy.com
PREIS & ROY, APLC
Wesleyan Tower
24 Greenway Plaza, Suite 2050
Houston, Texas 77046
Telephone: (713) 355-6062
Facsimile: (713) 572-9129

John M. Elsley
TBN: 06591950
SDTX: 2828
john.elsley@roystonlaw.com
ROYSTON, RAYZOR, VICKERY &
WILLIAMS, LLP
Pennzoil Place
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945

**ATTORNEYS FOR LIMITATION PETITIONERS TRITON ASSET LEASING GmbH, TRANSOCEAN HOLDINGS LLC, TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC. AND TRANSOCEAN DEEPWATER INC.**

**OF COUNSEL:**

EDWARD F. KOHNKE, IV
*Pro Hac Vice* Admission Requested
LBN: 07824
nkohnke@preisroy.com
EDWIN G. PREIS, JR.
TBN: 24029069
SDBN: 16834
epreis@preisroy.com
RICHARD J. HYMEL
*Pro-Hac Vice* Admission requested
TBN: 24038190
CARL J. Hebert
LBN: 06724
SDBN: 15985
PREIS & ROY, APLC
102 Versailles Blvd., Suite 400
Lafayette, Louisiana 70509
(377) 237-6062 – Telephone
(377) 237-9129 – Facsimile

INNES MACKILLOP
TBN# 12761800
SDTX#444
WHITE MACKILLOP & GALLANT P.C.
2200 West Loop South, Suite 1000
Houston, TX 77027
Telephone: (713) 599-0211
Facsimile: (713) 599-1355
imackillop@wmlegal.com

GEORGE M. GILLY
LBN: 6234
SDTX ID No. 16885
gillyg@phelps.com
EVANS MARTIN MCLEOD
LBN: 24846
SDTX *Pro Hac Vic* Admission requested
mcleodm@phelps.com
PHELPS DUNBAR, LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130

and

MARC G. MATTHEWS
TBN: 4055921
SDTX ID No. 705809
marc.matthews@phelps.com
700 Louisiana, Suite 2600
Houston, Texas 77002
Telephone: (713) 626-1386
Facsimile: (713) 626-1388

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has on this 25 day of June, 2010, been served on the following counsel of record in this proceeding by:

(  ) Hand Delivery      (  ) Prepaid U.S. Mail
(  ) Federal Express    (  ) E-Mail
( x ) ECF