IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, TRANSOCEAN HOLDINGS, L.L.C., TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC., AND TRANSOCEAN DEEPWATER INC., AS OWNER, MANAGING OWNERS, OWNERS PRO-HAC VICE, AND/OR OPERATORS OF THE MODU DEEPWATER HORIZON, IN A CAUSE FOR EXONERATION FROM OR LIMITATION OF LIABILITY | § § § § § § § § § § § § § § | MDL NO. 2179<br><br>SECTION: J<br><br>JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |

This Document Relates to: 10-2771

## CLAIMS AND ANSWERS TO PETITION FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, FLOYD, FLOYD, PEARCE OF BEAUMONT, L.P., FLOYD, FLOYD & SONS, L.L.C. D/B/A FLOYD'S CAJUN SEAFOOD HOUSE; FLOYD'S RESTAURANTS OF PEARLAND, INC. D/B/A FLOYD'S CAJUN SEAFOOD & TEXAS STEAKHOUSE; BRET FLOYD; COASTLINE SEAFOOD INTERNATIONAL, L.L.C.; FLOYD LANDRY; CATFISH CABIN, INC.; TIM JAMES; NICHOLAS JOHNSON; JEREMY JOHNSON; BIG JOHNSON CHARTERS, INC., TIM BERRYMAN D/B/A CATFISH CABIN, TIMOTHY GLEN BERRYMAN, REBECCA A. BERRYMAN, RICKY LANE, D/B/A LUCK IN A BUCKET BAIT SHOP, AND PAUL MALIN D/B/A PAUL'S SEAFOOD'S, through undersigned counsel (hereinafter referred to as "Claimants") who, for answer to the original Complaint of TRITON ASSET LEASING GmbH, TRANSOCEAN HOLDINGS, L.L.C., TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC., AND TRANSOCEAN DEEPWATER INC., AS OWNER, MANAGING

OWNERS, OWNERS PRO-HAC VICE, AND/OR OPERATORS OF THE MODU DEEPWATER HORIZON (hereinafter referred to as "Petitioners"), denies each and every allegation contained therein that is not hereinafter specifically admitted.

Further answering, categorically, the several allegations of the Original Complaint, Claimants says:

Further answering the Complaint of Petitioners, Claimant avers as follows:

I.

Claimants admit the allegation in Paragraph I of Petitioner's Verified Complaint.

II.

Claimants have no basis on which to admit or deny allegation in Paragraph II of Petitioner's Verified Complaint. However, based on reasonable belief and information Claimant admits the allegations in Paragraph II of Petitioner's Verified Complaint.

III.

Claimants have no basis on which to admit or deny allegation in Paragraph III of Petitioner's Verified Complaint. However, based on reasonable belief and information Claimants admit the allegations in Paragraph III of Petitioner's Verified Complaint.

IV.

Claimants have no basis on which to admit or deny allegation in Paragraph IV of Petitioner's Verified Complaint. However, based on reasonable belief and information Claimants admit the allegations in Paragraph IV of Petitioner's Verified Complaint.

V.

Claimants have no basis on which to admit or deny allegation in Paragraph V. of Petitioner's Verified Complaint. However, based on reasonable belief and information Claimants admit the allegations in Paragraph III of Petitioner's Verified Complaint.

VI.

At this time, Claimants lack the information necessary in order to admit or deny the allegation contained in Paragraph VI of Petitioner's Verified Complaint.

VII.

Claimants contest and/or deny allegations that said vessel, Deepwater Horizon, was tight, staunch, strong, and seaworthy, and was properly manned, equipped and supplied. Additionally, Claimants contest and/or deny allegations that the owners, operators and/or persons at interest in said vessel, at the commencement of the voyage hereinafter mentioned, and at all times material thereto, exercised due diligence to make said vessel tight, staunch, strong, properly manned, properly equipped and supplied and in all respects seaworthy.

At this time, Claimants do not have enough information in order to admit or deny the remaining allegations contained in Paragraph VII of Petitioner's Verified Complaint.

VIII.

Claimants admit the allegation in Paragraph VIII. of Petitioner's Verified Complaint.

IX.

At this time, Claimants lack the information necessary in order to admit or deny the allegation contained in Paragraph IX of Petitioner's Verified Complaint.

X.

Claimants contest and/or deny all allegations contained in Paragraph X of Petitioner's Verified Complaint.

XI.

Claimants contest and/or deny all allegations contained in Paragraph XI of Petitioner's Verified Complaint.

XII.

Claimants contest and/or deny all allegations contained in Paragraph XII of Petitioner's Verified Complaint.

XIII.

At this time, Claimants lack the information necessary in order to admit or deny the allegation contained in Paragraph XIII of Petitioner's Verified Complaint.

XIV.

Claimants contest and/or deny all allegations contained in Paragraph XIV of Petitioner's Verified Complaint.

XV.

At this time, Claimants lack the information necessary in order to admit or deny the allegations contained in Paragraph XV of Petitioner's Verified Complaint.

XVI.

Claimants have no basis on which to admit or deny allegation in Paragraph XVI of Petitioner's Verified Complaint. However, based on reasonable belief and information Claimants admit the allegations in Paragraph XVI of Petitioner's Verified Complaint.

XVII.

At this time, Claimants lack the information necessary in order to admit or deny

the allegations contained in Paragraph XVII of Petitioner's Verified Complaint.

## XVIII.

Claimants contest and/or deny all allegations contained in Paragraph XVIII of Petitioner's Verified Complaint.

## XIX.

Claimants contest and/or deny all allegations contained in Paragraph XIX of Petitioner's Verified Complaint.

## XX.

Claimants contest and/or deny all allegations contained in Paragraph XX of Petitioner's Verified Complaint.

## XXI.

At this time, Claimants lack the information necessary in order to admit or deny the allegations contained in Paragraph XXI of Petitioner's Verified Complaint.

## XXII.

Claimants contest and/or deny all allegations contained in Paragraph XXII of Petitioner's Verified Complaint.

## XXIII.

At this time, Claimants lack the information necessary in order to admit or deny the allegations contained in Paragraph XXIII of Petitioner's Verified Complaint.

## XXIV.

At this time, Claimants lack the information necessary in order to admit or deny the allegations contained in Paragraph XXI of Petitioner's Verified Complaint.

XXV.

Claimants contest and/or deny the allegations and/or requests contained in the Prayer of said Complaint and Petition for Exoneration from and/or Limitation of Liability.

Further answering the Complaint of Petitioners, Claimant avers as follows:

### FIRST DEFENSE

The Complaint of Petitioners fail to state a claim or cause of action upon which relief can be granted.

### SECOND DEFENSE

Claimants reserve the right to contest to appraisal value of the Deepwater Horizon, her tackle, apparel, appurtenances, pending freight, etc., and the adequacy of the security.

### THIRD DEFENSE

Claimants reserve the right to challenge the status of the Petitioners as the owner/operator of the Deepwater Horizon and thereby reserves the right to challenge the Petitioner's entitlement to seek limitation of or exoneration from liability in this matter.

### FOURTH DEFENSE

In the alternative that if Claimants are able to prove the allegations asserted against Petitioners and the Deepwater Horizon in the claims filed in the United States District Court, Eastern District of Texas, Beaumont Division, CA NO. 1:10-CV-00445-MAC, including but not limited to allegations of fault, negligence and unseaworthiness, Claimant avers that such allegations occurred within the privity and knowledge of Petitioner, and accordingly, Petitioners cannot limit its liability.

## FIFTH DEFENSE

Claimants deny that $26,764,083 is an appropriate valuation for the limitation fund in this matter and further objects to the failure of Petitioners to post a bond for an appropriate limitation fund value and objects to Petitioners' offering only an Ad Interim Stipulation for value in the amount of $26,764,083.00. Claimants reserve the right to amend this response once a proper valuation of the vessel and the limitation fund as a whole has been obtained.

## SIXTH DEFENSE

On information and belief, Deepwater Horizon had a market value far in excess of $26,764,083.00, immediately following this casualty. This Court should accordingly appoint a Commissioner in due course to appraise said vessel.

## SEVENTH DEFENSE

Claimants furthers allege that there was insurance coverage covering liabilities of Petitioner which arose aboard the Deepwater Horizon which insured Petitioners in the event of an occurrence such as that which is the subject of Claimants' claim in this proceeding and Claimants' pending State court lawsuit, and said proceeds of said insurance policy should be included in this limitation proceeding as part of the fund, in the event the Court determines that these limitation proceedings are appropriate, which they are not.

## EIGHTH DEFENSE

Claimants further allege that Petitioners have failed to provide adequate security and for that reason, Petitioners' petition should be dismissed.

## NINTH DEFENSE

Without waiving the claim that Petitioners are not entitled to exoneration from or

limitation of liability, Claimants reserve their right to demand their right to trial by jury in the forum of his choice pursuant to the "savings to suitors" clause of the Judiciary Act of 1789, 28 U.S.C. § 1333.

## TENTH DEFENSE

Without waiving the claim that Petitioners are not entitled to exoneration from or limitation of liability, Claimants reserve their rights provided under Rule F(7) of the Supplemental Rules For Certain Admiralty and Maritime Claims under the Federal Rules of Civil Procedure to demand that the amount of security referred to in Petitioners' Ad Interim Stipulation be increased on the grounds that it is less than Petitioners' interest in the Deepwater Horizon, or on the grounds that it is insufficient to carry out the provisions of the statutes relating to claims in respect of loss of life or bodily injury. 46 U.S.C. § 183(b-f).

## CLAIM

Deepwater Horizon was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001. It was owned by Transocean Ltd. and leased to BP through September 2013. It was one of the largest rigs of its kind.

BP leased the Deepwater Horizon to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252 off the coast of Louisiana.

On April 20, 2010, the Deepwater Horizon was creating a cement seal and plug of the wellhead as part of the final phases of turning the Macondo well from an exploratory well into a production well. "Cementing" is delicate work that carries the risk of a blowout, which is the uncontrolled release of oil from the well.

During the course of this cementing work, an explosion occurred on the Deepwater Horizon and it caught fire. Investigators believe the explosion was a blowout, likely

caused by the cementing work the Deepwater Horizon had been performing. The fire burned for two days, and the rig began to list progressively more until it finally sank on April 22, 2010.

The Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the Deepwater Horizon sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape underwater, now extends from the well to 1,500 feet above the seabed and then buckles back down. Oil is flowing out from the open end of the riser and from two places along its length.

Although the now-leaking wellhead is fitted with a blowout preventer, known as a BOP, a stack of hydraulically activated valves at the top of the well designed to pinch the pipe closed, cut it, and seal off the well in the event of a sudden pressure release exactly like the one that occurred during the Deepwater Horizon blowout, the response teams have been unable to activate the Deepwater Horizon's BOP.

If the BOP on the wellhead had been functional, it could have been manually or automatically activated right after the explosion, cutting off the flow of oil at the wellhead, limiting the spill to a minute fraction of its current severity and thereby sparing Plaintiffs millions of dollars in losses and damage.

At the time of this filing, the wellhead has not been capped and the flow of oil continues unabated into the Gulf waters. The ever-expanding oil slick made landfall on the fragile coastline on Friday morning, April 30, 2010, and will continue to affect more and more Gulf coastline as it is driven landward by currents and winds. Although BP has begun drilling a relief well to stop the flow to the leaking well, the relief well may take months to complete, while oil continues to flow out of the leaking well.

While the media has compared this spill to the 1989 Exxon Valdez disaster, one crucial difference is that the Valdez was a tanker with a limited supply of oil. Experts estimate that the volume of this continuous gush of oil will eclipse that of the Valdez spill within 50 days. In contrast, the relief well will most likely take 60 to 90 days to complete, virtually ensuring this spill's classification as the worst oil spill in history.

What is worse, the floating booms BP has set out to block the oil from reaching the coastline may be too low and/or be placed too far out to sea to be useful. Experts report that anything higher than a three-foot wave will clear the boom, lifting the oil slick over the barriers with it. Over the past days, the Gulf has been experiencing seven to ten foot swells, diminishing the usefulness of the booms.

As the oil continues to make landfall along the Gulf Coast, it will cause severe damage to the delicate wetlands and intertidal zones that line the coast of, destroying the habitats where fish, shellfish and crustaceans breed, spawn, and mature.

The timing of this disaster makes it even more damaging, as May is spawning season for some sea life and migration time for the young of some species of shrimp and various pelagic fish.

Such devastation at the literal source of life for so many species will severely damage and perhaps even destroy the livelihoods of the Plaintiffs who rely on this sea life for their livelihoods. Plaintiffs are businesses and individuals who rely on the natural resources found in the Gulf of Mexico, including fish, shellfish, shrimp, oysters and other aquatic life, for their livelihood.

On May 2, 2010 the National Oceanographic and Atmospheric Administration ("NOAA") restricted fishing for a minimum of ten days in waters between Louisiana state waters at the mouth of the Mississippi River to the waters off Florida's Pensacola Bay,

an area of 6,800 square miles. The NOAA may soon declare a "fisheries disaster" in the area.

The Gulf region accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output, in total harvesting more than one billion pounds of finfish and shellfish per year. Nearly a third of all marine recreational fishing trips, including those part of the $1 billion per year sport fishing industry, take place on Gulf waters, according to the NOAA. In 2008, the 3.2 million recreational fishermen in the Gulf of Mexico region took 24 million fishing trips. All of these activities and businesses will be severely impacted or destroyed by this catastrophic spill.

The risks of offshore drilling are well known to Petitioners, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other seas such as the North Sea. Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to disastrous results like this incident.

Moreover, Petitioners knew the work the Deepwater Horizon was performing was especially risky. In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the Deepwater Horizon was doing when it exploded.

Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with regularity, and most frequently in the Gulf of Mexico. Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991. Nearly all the blowouts examined occurred in the Gulf of Mexico.

Petitioners were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work. During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

The threat of blowouts increases as drilling depth increases. Deepwater Horizon was drilling in 5,000 feet of water, to a total depth of 18,000 feet below the sea floor. Petitioners were aware of the high risk of blowouts from such deep drilling.

In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanism, the BOP. Petitioners were aware of the risk of the BOP failing at greater depths, yet did not install a backup BOP activation system or a backup BOP.

A 2004 study by federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 14 rigs studied in 2004 had BOPs able to squeeze off and cut the pipe at the water pressures present at the equipments' maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said. Moreover, the study singled out Cameron, the manufacturer of the Deepwater Horizon's BOP, for relying on faulty calculations to determine the needed strength for its BOP equipment to function properly at greater depths.

Petitioners could have installed a back up trigger to activate the BOP in the event of the main trigger failing to activate it. Although the backup trigger is a common drill-rig requirement in other oil-producing nations, including other areas where BP operates, the Deepwater Horizon was not equipped with this backup remote BOP trigger.

Nor was the Deepwater Horizon equipped with a second, backup BOP, as newer rigs increasingly are. The Deepwater Horizon only had one BOP installed, leaving the wellhead vulnerable to disaster if the single BOP fails, as it may have done in this case.

Petitioners' failure to take precautionary backup measures when drilling at depths they knew to be especially risky is made all the worse by the fact that Petitioners were drilling so close to an extremely delicate and important natural resource: the Gulf Coast marshes, wetlands, and estuaries that are a wellspring of marine life, and the source of Plaintiffs' livelihoods.

Defendant BP has a history of cutting corners on safety to reduce operating costs. In 2005, a blast at a Texas refinery killed 15 people and injured more than 170; federal investigators found the explosion was in part due to cost-cutting and poor maintenance. Also in 2005, a large production platform in the Gulf of Mexico began listing severely due to a defective control system. And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline.

Nevertheless, BP continues to fight for less regulation of the oil exploration and production industry. In 2009, Defendant BP spent $16 million lobbying the federal government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and its knowledge of the high risks involved in such drilling.

Moreover, Petitioners have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice. The Deepwater Horizon incident is a tragic example to the contrary.

The fire and explosion on the Deepwater Horizon, its sinking and the resulting oil spill were caused by the negligence of Petitioners, which renders them liable jointly and severally to Plaintiffs for all their damages.

Petitioners knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs, and the Gulf of Mexico's marine and coastal environments and estuarine areas, where Plaintiffs work and earn a living. Moreover, additional safety mechanisms, technologies, and precautions were known and available to Petitioners, but Petitioners chose not to employ them on the Deepwater Horizon.

After the explosion, Petitioners attempted to downplay and conceal the severity of the oil spill. Their initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels of oil per day. Moreover, Petitioners were slow and incomplete in their announcements and warnings to Gulf Coast residents and business people about the severity, forecast, and trajectory of the oil spill.

The oil spill and the resulting contamination have caused and will continue to cause loss of revenue to Plaintiffs, Individually and to their businesses, because Plaintiffs cannot use the Gulf of Mexico shore to work and to earn a living.

There are many other potential effects from the oil spill that have not yet become known, and Plaintiffs reserve the right to amend this petition once additional information becomes available.

## V. PETITIONERS' NEGLIGENCE

The Petitioners owed a legal duty to the Plaintiffs. Specifically, the Petitioners owed a duty to all Plaintiffs to exercise reasonable care in the manufacture,

maintenance and operation of the Deepwater Horizon. Petitioners breached their duty in the following ways:

(a) Failing to properly maintain and/or operate the Deepwater Horizon;

(b) Operating the Deepwater Horizon in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

(c) Failing to properly inspect the Deepwater Horizon to assure that all equipment and personnel were fit for their intended purpose;

(d) Acting in a careless and negligent manner;

(e) Failing to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon, which would have prevented the disaster;

(f) Failing to take appropriate action to avoid or mitigate the accident;

(g) Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h) Failing to ensure that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

(i) Failure to timely warn;

(j) Failure to timely bring the oil release under control;

(k) Failure to provide appropriate disaster preventative equipment;

(l) Acting in a manner that justifies imposition of punitive damages; and

(m) Such other acts and omissions as will be shown at the trial of this matter.

The blowout explosion, fire and resulting oil spill and the disastrous results are the Plaintiffs' damages which were proximately caused by Petitioners' negligence.

The injuries and damages to Plaintiffs were also caused by or aggravated by the fact that Petitioners failed to take necessary actions to mitigate the danger associated with their operations.

Furthermore, the disaster would not have occurred had the Petitioners exercised a high degree of care. Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

## VI. **PETITIONERS' GROSS NEGLIGENCE**

The Petitioners' acts and/or omissions constitute conscious-indifference malice or gross negligence. The Petitioners' acts and/or omissions involved an extreme degree of risk and the Petitioners had actual, subjective awareness of the risk but proceeded with a conscious indifference to the rights, safety or welfare of others, including the Plaintiffs.

Petitioners owed a duty to all Plaintiffs to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon.

Petitioners had a heightened duty of care to all Plaintiffs because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work such as that Deepwater Horizon was performing at the time of the explosion.

Petitioners breached their legal duty to Plaintiffs, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of others, including Plaintiffs in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

Petitioners knew or should have known that their wanton or reckless conduct would foreseeably result in a disastrous blowout and oil spill, causing damage to the economic interests of individuals and businesses in the area affected by the oil spill.

As a direct and proximate result of Petitioners wanton or reckless conduct, Plaintiffs have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of livelihood, loss of income, and other economic loss.

Petitioners' wanton or reckless conduct, as described herein, entitles Plaintiffs to punitive damages.

## VII. PETITIONERS' NEGLIGENCE *PER SE*

Petitioners' conduct with regard to the manufacture, maintenance, and/or operation of drilling operations and oil rigs such as the Deepwater Horizon is governed by numerous state laws, and permits issued under the authority of these laws.

These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs.

Petitioners' violations of these statutory standards constitute negligence *per se* under Texas law.

Petitioners' violations of these statutory standards proximately caused Plaintiffs' injuries, warranting compensatory and punitive damages.

## PRAYER FOR RELIEF

Plaintiffs demand judgment against Petitioners, jointly and severally, as follows:

a. Economic and compensatory damages in amounts to be determined at trial;

b. Punitive damages;

c. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

d. Attorneys' fees and costs;

e. Such other and further relief available under all applicable state laws

and any relief the Court deems just and appropriate.

Wherefore, premises considered, Claimants pray that FLOYD, FLOYD, PEARCE OF BEAUMONT, L.P., FLOYD, FLOYD & SONS, L.L.C. D/B/A FLOYD'S CAJUN SEAFOOD HOUSE; FLOYD'S RESTAURANTS OF PEARLAND, INC. D/B/A FLOYD'S CAJUN SEAFOOD & TEXAS STEAKHOUSE; BRET FLOYD; COASTLINE SEAFOOD INTERNATIONAL, L.L.C.; FLOYD LANDRY; CATFISH CABIN, INC.; TIM JAMES; NICHOLAS JOHNSON; JEREMY JOHNSON; BIG JOHNSON CHARTERS, INC., TIM BERRYMAN D/B/A CATFISH CABIN, TIMOTHY GLEN BERRYMAN, REBECCA A. BERRYMAN, RICKY LANE, D/B/A LUCK IN A BUCKET BAIT SHOP, AND PAUL MALIN D/B/A PAUL'S SEAFOOD'S Complaint seeking exoneration from or limitation of liability be dismissed; alternatively, Claimant prays that the Court appoint a Commissioner to appraise the vessel and that Claimant have judgment against Petitioner for the full value of his claims, including pre-judgment and post-judgment interest and costs of court; and for such other and further relief to which Claimant may be justly entitled.

Respectfully submitted,

PROVOST ★ UMPHREY
LAW FIRM, L.L.P.
Attorney at Law
Post Office Box 4905
Beaumont, Texas 77704
(409) 835-6000
(409) 838-8888 - Fax Number

WALTER UMPHREY
STATE BAR NUMBER: 20380000
JACQUELINE RYALL
STATE BAR NUMBER: 17469445
MATTHEW C. MATHENY
STATE BAR NUMBER: 24039070
ATTORNEY FOR CLAIMANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has on this the ____ day of _____, 2010, been forwarded to all counsel of record by U. S. Mail, Certified, Return Receipt Requested.

MATTHEW C. MATHENY