UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | : : : : : | MDL NO. 2179 SECTION:  J |
| THIS DOCUMENT RELATES TO THE *TRANSOCEAN* LIMITATION ACTION, NO. 10-2771 | : : : | JUDGE BARBIER MAG. JUDGE SHUSHAN |

. .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .  . .

## ANSWER TO VERIFIED COMPLAINT  FOR EXONERATION, CLAIMS, COUNTER-CLAIMS, AND CROSS-CLAIMS OF CAMERON INTERNATIONAL CORPORATION

Pursuant to the Federal Rules of Civil Procedure, Supplemental Admiralty Rule F(5), and the Stipulated Order Governing Deadlines in Connection with Petitioners' Rule 14(c) Complaint and Certain Bundle C Pleadings [Doc. 1730 in No. 10-2179] and in strict compliance with the terms of the Second Amended Order Directing Claimants to File and Make Proof of Claims, Directing the Issuance of Monition, and Restraining Prosecution of Claims issued in this action ["Restraining Order," Doc. 130-1], but without waiving its right to pursue some or all of its claims outside this proceeding on the ground that the maritime limitation statute, 46 U.S.C. § 30505, does not apply to or govern those claims, Defendant Cameron International Corporation ("Cameron"), respectfully submits the following: (a) Answer in response to the Verified Complaint for Exoneration from or Limitation of Liability filed by Petitioners Triton Asset Leasing GmbH, Transocean Holdings LLC, Transocean Offshore Deepwater Drilling, Inc., and Transocean Deepwater, Inc. (the "Complaint") and (b) Claims (and to the extent applicable,

Counter-Claims) against Petitioners and Cross-Claims (and to the extent applicable, Third-Party Claims) against tendered and impleaded defendants in connection with (i) Petitioners' Rule 14(c) Complaint; (ii) the First Amended Master Complaint, Cross-Claim, and Third-Party Complaint for Private Economic Losses in Accordance with PTO No. 11 [CMO No. 1] Section III(B1)["B1 Bundle"] [Doc. 1128 in 10-2179], together with all short form joinders in that complaint, and (iii) any short form joinders in the Local Government Voluntary Master Complaint, Cross-Claim and Third-Party Claim [Doc. 1510 in 10-2179].

## ANSWER TO THE VERIFIED
## COMPLAINT FOR EXONERATION

### Jury Demand

Cameron demands trial by jury of all issues in this action so triable.

### Reservation of Right to Amend

Discovery is ongoing. Cameron therefore reserves its right to amend this pleading.

### Responding to Allegations in the Complaint

1.      Cameron submits that the tort claims against Petitioners in this action and any claims for contribution or allocation of fault are governed by federal law other than general maritime law under the terms of the Outer Continental Shelf Lands Act ("OCSLA") and/or the Oil Pollution Act of 1990 ("OPA"), and that OCSLA and OPA limit the applicability of maritime law or admiralty procedure to many of the issues that have been raised in this action, but Cameron admits that this Court has admiralty jurisdiction under 28 U.S.C. § 1333 to resolve the requests for relief asserted by Petitioners in the Complaint under the maritime limitation statute, 46 U.S.C. §§ 30505, 30506.

1053668v.1

2.      Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 2.

3.      Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 3.

4.      Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 4.

5.      Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 5.

6.      Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 6.

7.      Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 7.

8.      Cameron admits the allegations in paragraph 8.

9.      With respect to the allegations contained in paragraph 9 of the Complaint, Cameron admits that there were explosions and fires in April, 2010 in connection with oil and gas development operations conducted from the *Deepwater Horizon*, that these explosions and fires resulted in personal injury and death to certain persons, and that the drilling unit ultimately sank, but Cameron is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 9.

10.     Cameron denies the allegations contained in paragraph 10.

11.     Cameron denies the allegations contained in paragraph 11.

12.     Cameron denies the allegations contained in paragraph 12.

-3-

13.     Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13.

14.     Cameron admits that the claims described in paragraph 14 of the Complaint have been made against one or more Petitioners, and denies that Petitioners are without responsibility for those claims, but is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 14.

15.     Cameron admits that the claims described in paragraph 15 of the Complaint have been made against one or more Petitioners, but is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 15.

16.     Cameron admits that the claims described in paragraph 16 of the Complaint have been made against one or more Petitioners, but is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 16.

17.     In response to the outdated allegations in paragraph 17, Cameron submits that venue is now proper in this district.

18.     Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 18.

19.     Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19.

20.     To the extent that the allegations of paragraph 20 of the Complaint go beyond descriptions of Petitioners' intentions and claims, Cameron denies the allegations of paragraph 20 of the Complaint.

1053668v.1

21.     Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 21.

22.     To the extent that the allegations contained in paragraph 22 of the Complaint extend beyond Petitioners' statement of intentions, claims and legal conclusions, Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 22.

23.     Cameron is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23, except that Cameron admits that the Complaint had to have been filed within six months from the date Petitioners first received notice of a claim concerning the voyage.

24.     Cameron admits that the Complaint asserts a request for relief subject to admiralty and maritime jurisdiction, but otherwise denies the allegations in paragraph 24.

## Failure to State a Claim

25.     The Complaint fails to state a claim upon which relief may be granted against Cameron.

**Affirmative Defense – Contract Claims Not Subject to Limitation**

26.     Some or all of the claims of Cameron related to the *Deepwater Horizon* are not claims subject to limitation under the terms of 46 U.S.C. § 30505, because, *inter alia*, certain of those claims arise under obligations of contracts entered into by a Petitioner or a predecessor of Petitioners and therefore binding on Petitioners.

**Affirmative Defense – Contract Claims Not Subject to Proper Injunction**

27.     Under the terms of Supplemental Admiralty Rule F(3), Cameron should not have been enjoined, and should not henceforth be enjoined, from proceeding with a separate action against Petitioners to recover for claims related to the *Deepwater Horizon* that are not subject to limitation under the terms of 46 U.S.C. § 30505.   In filing its Answer and Claims in this proceeding, therefore, Cameron expressly reserves all rights to pursue separate litigation against Petitioners for resolution of all issues beyond the exclusive jurisdiction of this Admiralty Court, and does not agree to join all issues in this proceeding by filing its Answer and Claims. Furthermore, Cameron may move for an order modifying the Restraining Order to permit Cameron to pursue its claims in the forum of its choice.

**Affirmative Defense – Substantive and Procedural
Pre-emption of Economic Loss Claims by OPA**

28.     All the claims asserted in the B1 Complaint and C Complaint that involve Cameron are governed by OPA.   Furthermore, not only do the substantive liability provisions of OPA pre-empt all other legal bases for those claims, including general maritime law, but also the mandatory claims and related procedural provisions of OPA pre-empt application of the

1053668v.1

limitation action and Rule F procedure to resolution of those claims.  Any inclusion of those claims in this limitation action is therefore precluded as a matter of applicable law.

## CLAIMS AGAINST PETITIONERS AND
## CROSS-CLAIMS AGAINST IMPLEADED CO-DEFENDANTS

In accordance with the terms of the outstanding scheduling orders and in compliance with the strict terms of the Restraining Order, while reserving its affirmative defenses as stated above, and specifically reserving its right to prosecute its claims against Petitioners in a separate lawsuit outside this proceeding upon modification of the Restraining Order, Cameron, now acting as Claimant, Counter-Plaintiff, Cross-Plaintiff, and Third-Party Plaintiff, makes the following allegations, on the basis of information and belief or otherwise, and asserts the following claims and/or counter-claims against Petitioners and the following cross-claims and/or third-party claims against the tendered and impleaded defendants in this limitation action, namely BP p.l.c.; BP Exploration and Production, Inc. ("BP E&P"); BP America Production Company ("BP America"); Halliburton Energy Services, Inc. ("Halliburton"); M-I LLC ("MI"); Anadarko Petroleum Corporation ("Anadarko Corp."); Anadarko E&P Company, LP ("Anadarko E&P"); MOEX Offshore 2007 LLC ("MOEX Offshore"); MOEX USA Corporation ("MOEX USA"); Mitsui Oil Exploration Co. Ltd. ("Mitsui"); Weatherford International Ltd. ("Weatherford Int'l"); Weatherford U.S. L.P. ("Weatherford US"); Dril-Quip, Inc. ("Dril-Quip"); Marine Spill Response Corporation ("MSRC"); Airborne Support, Inc. ("Airborne Inc."); Airborne Support International, Inc. ("Airborne Int'l"); Lynden, Inc. ("Lynden"); Dynamic Aviation Group, Inc. ("Dynamic"); International Air Response, Inc. ("IAR"); Lane Aviation ("Lane"); National Response

1053668v.1

Corporation ("NR"); O'Brien Response Management, Inc. ("O'Brien"); Tiger Safety, LLC ("Tiger"); DRC Emergency Services LLC ("DRC"); and Nalco Company ("Nalco") as Cross-Defendants (collectively "Cross-Defendants"):

29.     Cameron International Corporation ("Cameron") is a corporation organized and existing under the laws of the State of Delaware, with its principal office in Houston, Texas. Cameron was formerly known as Cooper Cameron Corporation.  Petitioners initiated this proceeding and are therefore already parties to this action.  The Cross-Defendants have been named defendants in one or more pleadings in this action and are therefore already parties to this action.

### Pertinent Facts

### *The DRILLING CONTRACT*

30.     Effective December 9, 1998, Vastar Resources, Inc. ("Vastar") and R&B Falcon Drilling Co. ("R&B Falcon") entered into a Drilling Contract for the *Deepwater Horizon* semisubmersible drilling unit RBS-8D (the "DRILLING CONTRACT").  Section 15.2 of the DRILLING CONTRACT obligated R&B Falcon as CONTRACTOR to "use the blowout prevention equipment specified in Exhibit B hereof on all strings of casing unless otherwise directed by" Vastar as COMPANY.  Section E2 of Exhibit B-2 to the DRILLING CONTRACT stated the specifications for the well control equipment required by Vastar for use on the drilling unit under the DRILLING CONTRACT, a series of component products to be assembled into what is commonly referred to as a blowout preventer or BOP or BOP stack.

31.     Section 24.2 of the DRILLING CONTRACT contained the following indemnity provision applicable to Vastar as COMPANY and R&B Falcon as CONTRACTOR:

-8-

**COMPANY SHALL ASSUME FULL RESPONSIBILITY FOR AND SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD CONTRACTOR HARMLESS FROM AND AGAINST ANY LOSS, DAMAGE, EXPENSE, CLAIM, FINE, PENALTY, DEMAND OR LIABLITY FOR POLLUTION OR CONTAMINATION, INCLUDING CONTROL AND REMOVAL THEREOF, ARISING OUT OF OR CONNECTED WITH OPERATIONS UNDER THIS CONTRACT HEREUNDER AND NOT ASSUMED BY CONTRACTOR IN ARTICLE 24.1 ABOVE, WITHOUT REGARD FOR NEGLIGENCE OF ANY PARTY OR PARTIES AND SPECIFICALLY WITHOUT REGARD FOR WHETHER THE POLLUTION OR CONTAMINATION IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR FAULT OF CONTRACTOR.**

This indemnity agreement appears in all caps and bold in the original.  In conjunction with section 24.1 referenced in this section, the indemnity of section 24.2 applied to all releases of crude oil below the surface of land or water.

32.     Section 25.1 of the DRILLING CONTRACT contained the following additional provision clarifying the DRILLING CONTRACT's other indemnity provisions, including section 24.2:

**EXCEPT TO THE EXTENT ANY SUCH OBLIGATION IS SPECIFICALLY LIMITED TO CERTAIN CAUSES ELSEWHERE IN THIS CONTRACT, THE PARTIES INTEND AND AGREE THAT THE PHRASE "SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS" MEANS THAT THE INDEMNIFYING PARTY SHALL PROTECT, RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS THE INDEMNIFIED PARTY OR PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS FEES), JUDGMENTS AND AWARDS OF ANY KIND OR CHARACTER, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING PREEXISTING CONDITIONS, WHETHER SUCH CONDITIONS BE PATENT OR LATENT, THE UNSEAWORTHINESS OF ANY VESSEL OR VESSELS (INCLUDING THE DRILLING UNIT), BREACH OF CONTRACT, STRICT LIABILITY, TORT, OR THE NEGLIGENCE OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY,**

-9-

**WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, ACTIVE, PASSIVE OR GROSS OR ANY OTHER THEORY OF LEGAL LIABILITY AND WITHOUT REGARD TO WHETHER THE CLAIM AGAINST THE INDEMNITEE IS THE RESULT OF AN INDEMNIFICATION AGREEMENT WITH A THIRD PARTY.**

This clarification of the indemnity agreements appears in all caps and bold in the original. In sections 24.2 and 25.1 of the DRILLING CONTRACT, therefore, Vastar as COMPANY agreed unqualifiedly to take full responsibility for specified costs resulting from underwater oil spills, and for R&B Falcon's indemnity obligations to third parties in that regard.

33.     BP America Drilling Company ("BP America") is the successor to Vastar as COMPANY under the DRILLING CONTRACT.

34.     Petitioner TO Holdings LLC ("TO Holdings") is the successor to R&B Falcon as the CONTRACTOR under the DRILLING CONTRACT. Authorized agents of Petitioners TO Offshore Deepwater Drilling, Inc. ("TO Offshore") and TO Deepwater, Inc. ("TO Deepwater") performed many of the tasks of CONTRACTOR under the DRILLING CONTRACT.

### *The R&B Falcon Purchase Orders with Accompanying TERMS AND CONDITIONS*

35.     In October 1999, R&B Falcon and Cameron executed written "TERMS AND CONDITIONS" for R&B Falcon to purchase from Cameron specified BOP components and to contract for Cameron to assemble the components into a BOP stack for the drilling unit subject to the DRILLING CONTRACT. The executed terms and conditions specified in handwriting that they were "for use with R&B Falcon P.O. #s 087-00101 and 087-00015 only." The two identified purchase orders specified the purchase and sale of component parts and assembly in accordance with the "BOP Stack" specifications in Exhibit B-2 of the DRILLING CONTRACT.

-10-

36.     Section 18 of the TERMS AND CONDITIONS between R&B Falcon as "Purchaser" and Cameron as "Seller" contained the following indemnity provisions:

The Seller shall be liable and shall defend, release, indemnify and hold harmless and waive all rights of recourse against Purchaser and its customers, their parent, subsidiary, and affiliated companies, and their subcontractors together with their agents, employees, invitees, directors, officers, shareholders and insurers of each ("Purchaser Group") from and against any and all claims, demands or causes of action of every kind and character, brought by any person or party, for injury to, illness or death of any member of the Seller Group or for damage to or loss of property owned or leased by the Seller Group which injury, illness, death, damage or loss arises out of or is incident to the Operations REGARDLESS OF WHETHER CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT, SELLER'S SOLE, JOINT AND/OR SEVERAL NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILTY, UNSEAWORTHINESS OF ANY VESSEL, OR OTHER LEGAL RESPONSIBILITY OF PURCHASER GROUP.

The Purchaser shall be liable and shall defend, release, indemnify and hold harmless and waive all rights of recourse against Seller, its parent, subsidiary, and affiliated companies, and their subcontractors together with their agents, employees, invitees, directors, officers, shareholders and insurers of each ("Seller Group") from and against any and all claims, demands or causes of action of every kind and character, brought by any person or party, for injury to, illness or death of any member of the Purchaser Group or for damage to or loss of property owned or leased by the Purchaser Group which injury, illness, death, damage or loss arises out of or is incident to the Operations REGARDLESS OF WHETHER CAUSED IN WHOLE OR IN PART BY A PRE-EXISTING DEFECT, SELLER'S SOLE, JOINT AND/OR SEVERAL NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILTY, UNSEAWORTHINESS OF ANY VESSEL, OR OTHER LEGAL RESPONSIBILITY OF SELLER.

In the event that Purchaser is entitled to indemnity under any contract with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, Purchaser will provide Seller with the benefit of such indemnity to the fullest extent possible.

The capitalized typeface appears in the original of the TERMS AND CONDITIONS.

1053668v.1

37.     Because the parties to the TERMS AND CONDITIONS understood that the purchase orders governed by the TERMS AND CONDITIONS entailed the sale of equipment for a drilling unit that at times would perform its essential functions as an oceangoing vessel, the parties agreed that the TERMS AND CONDITIONS "shall be governed by the General Maritime Law of the United States."  The specified purchase orders for equipment to be installed on the *Deepwater Horizon*, together with the TERMS AND CONDITIONS applicable to those two purchase orders, are maritime contracts.

38.     TO Holdings as CONTRACTOR under the DRILLING CONTRACT is the successor to R&B Falcon responsible for the obligations of Purchaser under the specified purchase orders and the TERMS AND CONDITIONS for those purchase orders.

### *The Master Service Agreement*

39.     Effective September 28, 2000, TO Offshore, on behalf of itself, its subsidiaries, and "any other entity in which it owns, either directly or indirectly, at least a fifty percent (50%) equity interest" (denominated collectively as "Transocean") and Cameron as "Contractor" entered into a Master Service Agreement on a form provided by TO Offshore (the "MSA").  By that effective date, an Amendment No. 1 to the MSA had been executed by TO Offshore and Cameron adding a subparagraph to paragraph 15B of the MSA.

40.     Paragraph 1 of the MSA provides in part that "[a]s between the parties hereto, this Agreement shall control and govern all Work . . ., including purchase orders, ("Work Order")

1053668v.1

which are in any way connected with Transocean including, but not limited to, the performance

of all Work by Contractor, its affiliates, and/or its and their subcontractors for or with

Transocean, any of the Transocean subsidiaries or other entities, and/or any third party

(including any third party for whom or with which Transocean is rendering services or under

contract and regardless of whether or not a Work Order has been issued hereunder) where such

Work is performed at the same drill site, well location, vessel, fixed platform, or other location

(including on the way to or from such location) as Transocean is located, operating, and/or

performing services ("Work Premises")."   The MSA did not obligate Cameron to perform any

particular work in connection with the *Deepwater Horizon* or any other drilling unit or rig.   Nor

did the MSA "obligate Transocean to order any Work from Contractor."   MSA ¶ 3.

     41.     Paragraph 15A of the MSA provides as follows:

> Contractor shall defend, release, indemnify and hold harmless Transocean, its
> parents, subsidiaries, affiliates, officers, directors, employees and agents from and
> against all liens, claims, demands or causes of action, costs, expenses or losses
> (including but not limited to attorneys' fees) attributable to, for or on account of
> injury to, illness or death of employees, invitees, and/or agents of Contractor, its
> affiliates and subcontractors (other than Transocean and Transocean's agents,
> affiliates and subcontractors), or loss or damage to property of Contractor, its
> affiliates and subcontractors (other than Transocean and Transocean's agents,
> affiliates and subcontractors) which arise from, are incident to or result directly or
> indirectly from the performance of the Work, the presence of employees or
> invitees of Contractor at any job or worksite, or transportation to or from such
> locations, performance of this Agreement or breach hereof.

     42.     As added by Amendment No. 1, Paragraph 15B of the MSA provides as follows:

> Transocean shall defend, release, indemnify and hold harmless Contractor, its
> parents, subsidiaries, affiliates, officers, directors, employees and agents from and
> against all liens, claims, demands or causes of action, costs, expenses or losses
> (including but not limited to attorneys' fees) attributable to, for or on account of
> injury to, illness or death of employees, invitees, and/or agents of Transocean, its

-13-

affiliates and subcontractors (other than Contractor and Contractor's agents, affiliates and subcontractors), or loss or damage to property of Transocean, its affiliates and subcontractors (other than Contractor and Contractor's agents, affiliates and subcontractors) which arise from, are incident to or result directly or indirectly from the performance of the Work, the presence of employees or invitees of Transocean at any job or worksite, or transportation to or from such locations, performance of this Agreement or breach hereof.

Transocean agrees that if Transocean is entitled to indemnity under any contract with its customers or suppliers with respect to pollution, loss of hydrocarbons, damage to reservoirs, loss of hole or other damages associated with blowout or loss of well control, Transocean will provide Contractor with the benefit of such indemnity to the fullest extent possible.

43.     Paragraph 15C of the MSA provides as follows:

If it is judicially determined that with respect to injury, illness or death of employees of Contractor, 33 U.S.C. 905(c) would be applicable to this Agreement or the parties hereto or referred to herein, then Transocean shall be deemed to indemnify Contractor, its parents, subsidiaries, affiliates, officers, directors, agents, and employees from and against all liens, claims, demands, causes of action, costs, expenses or losses attributable to, for or on account of injury to, illness or death of employees of the "vessel" as such term is used in said statute, which arise from, are incident to, connected with, or result directly or indirectly from the performance of the Work, the presence of employees or invitees of Contractor at any job or worksite, or transportation thereof to or from such locations, performance of this Agreement or breach hereof.

44.     Paragraph 15E of the MSA provides as follows:

**ALL OF THE INDEMNITIES AND ALLOCATIONS OF RISK CONTAINED IN THIS PARAGRAPH 15 OR ELSEWHERE IN THIS AGREEMENT SHALL APPLY NOTWITHSTANDING THE SIMPLE, GROSS, SOLE, JOINT OR CONCURRENT NEGLIGENCE OF ANY PERSON OR PARTY (REGARDLESS OF WHETHER SUCH PERSON OR PARTY IS AN INDEMNITEE OR NOT), THE UNSEAWORTHINESS OR OTHER FAULT OF ANY VESSEL, "RUIN" OR STRICT LIABILITY, LIABILITY IMPOSED BY STATUTE, DEFECTS IN PREMISES, EQUIPMENT OR MATERIAL, OR ANY OTHER EVENT OR CONDITION WHETHER ANTICIPATED OR UNANTICIPATED AND**

-14-

**REGARDLESS OF WHETHER PRE-EXISTING THIS AGREEMENT. INDEMNITEES SHALL BE ENTITLED TO REASONABLE ATTORNEYS' FEES INCURRED IN ASSERTING OR ENFORCING THE INDEMNITIES GRANTED HEREIN.**

This paragraph 15E appears in all caps and bold in the original.

45.     Because the parties to the MSA understood that the specified Work under the MSA entailed the sale of equipment and provision of services for a drilling unit that in order to fulfill its essential function would at certain times operate as an oceangoing vessel, the parties agreed that the MSA "SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE GENERAL MARITIME LAWS OF THE UNITED STATES" without regard to conflicts of law rules that would lead to the application of other law.  The capitalized typeface appears in the original of the MSA.  The MSA is a maritime contract.

### *Installation and Transfer of Title to the Cameron Well Control Equipment*

46.     The Cameron equipment was ultimately installed on the *Deepwater Horizon* at a shipyard in Korea.  Authorized representatives of BP America and Counter-Defendants formally certified that the Cameron equipment satisfied the specifications of the DRILLING CONTRACT and the two purchase orders specified in the TERMS AND CONDITIONS as each had by then been duly amended.

47.     Title to the Cameron well control equipment passed from Cameron to TO Holdings or a subsidiary of TO Holdings in 2001.

-15-

### *The ADT Agreement*

48.     Effective March 29, 2006, Applied Drilling Technology, Inc. as CONTRACTOR, on behalf of itself and a number of subsidiaries and affiliates, entered into a Master Service Agreement with Cameron as SUBCONTRACTOR (the "ADT Agreement").  According to its paragraph 1.3, the ADT Agreement did "not obligate CONTRACTOR to order Work from" Cameron, but in accordance with its paragraph 7.0, the ADT Agreement did apply to all Work Orders issued pursuant to the ADT Agreement.

49.     Paragraph 9.2 of the ADT Agreement provided in pertinent part as follows:

**CONTRACTOR SHALL AT ALL TIMES BE RESPONSIBLE FOR, SHALL RELEASE, AND SHALL PROTECT, INDEMNIFY, DEFEND (INCLUDING PAYMENT OF REASONABLE ATTORNEYS' FEES AND COSTS OF LITIGATION) AND HOLD SUBCONTRACTOR GROUP HARMLESS FROM AND AGAINST ANY AND ALL COSTS, LOSSES, LIABILITIES, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, JUDGMENTS AND AWARDS OF EVERY KIND AND CHARACTER, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF ARISING IN CONNECTION HEREWITH . . .:**

**(a)     IN FAVOR OF THE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, CONSULTANTS, SERVANTS, REPRESENTATIVES OR INVITEES OF CONTRACTOR OR CONTRACTOR'S OTHER CONTRACTORS ON ACCOUNT OF SICKNESS, BODILY INJURY, DEATH OR DAMAGE TO, LOSS OF USE OF, OR LOSS OF PROPERTY OF SUCH PERSONS;**

**\*     \*     \***

**(c)     ON ACCOUNT OF OR DIRECTLY RESULTING FROM OIL POLLUTION (INCLUDING CONTROL AND REMOVAL THEREOF), UNCONTROLLED WELL FLOW OF OIL, GAS AND/OR WATER.**

-16-

This paragraph 9.2 appears in all caps and bold in the original.

50.     Because the parties to the ADT Agreement understood that the specified work under the ADT Agreement entailed the sale of equipment and provision of services for a drilling unit that in order to fulfill its essential function would at certain times operate as an oceangoing vessel, the parties agreed that the work orders entered into pursuant to the ADT Agreement "shall be exclusively determined, interpreted, litigated and construed in accordance with the United States General Maritime Law."  The ADT Agreement is a maritime contract.

51.     After the merger between affiliates of ADT and Petitioners, Petitioners as successors-in-interest under the ADT Agreement have issued Work Orders for performance by Cameron pursuant to the terms of the ADT Agreement.

### *Indemnity Terms Binding Under Cameron Repair Quotes*

52.     Petitioners also have issued repair orders pursuant to Repair Quotes issued by Cameron.  Cameron's acceptance of the Petitioners' orders pursuant to these Repair Quotes was expressly conditioned on Petitioners' acceptance of written terms and conditions included as part of those Repair Quotes, which denominated Cameron as Seller and a Petitioner as Buyer.

53.     Under paragraph 14A(3) of the Repair Quotes terms and conditions, a Petitioner, as Buyer, agreed that it "shall indemnify and hold [Cameron as] Seller Group harmless from and against all Claims for loss of or damage to the property (including the Work) of the members of the Buyer Group even if such Claims arise from or [are] attributable to the Negligence of the

members of Seller Group [i.e., Cameron]."  "Buyer Group" was defined in paragraph 14A of the Repair Quotes terms and conditions to include "Buyer, its parent (if any), subsidiaries, affiliates, co-workers, co-venturers and any entity with whom Buyer has an economic interest with respect to the Work including Buyer's customer and its and their respective employees, personnel, directors, officers, borrowed servants, representatives, agents, contractors and subcontractors (respectively and of any tier or level and who are not included within the Seller Group.)"

54.    Under paragraph 14A(4) of the Repair Quotes terms and conditions, a Petitioner, as Buyer, agreed that it "shall indemnify and hold [Cameron as] Seller Group harmless from and against all Claims for the death[s] of or personal injury(ies) to members of the Buyer Group even if such Claims arose from or [are] attributable to the Negligence of members of the Seller Group."

55.    Paragraph 14A(6) of the Repair Quotes terms and conditions provided as follows: "Buyer shall indemnify and hold the members of Seller Group harmless from and against all Claims (including clean-up costs and loss(es) of oil, gas or hydrocarbons) arising from pollution, contamination, dumping or spilling of any substance and even if arising out of or attributable to the Negligence of the members of the Seller Group."

### *Legal Validity of Indemnity Provisions of the TERMS AND CONDITIONS, MSA, and ADT Agreement*

56.    To the extent that work under the MSA, the ADT Agreement or the Repair Quotes involved oil and gas development on the Outer Continental Shelf, 33 U.S.C. § 905(c) would be applicable within the meaning of Paragraph 15C of the MSA and Paragraph 9 of the

ADT Agreement.  On April 20, 2010, the *Deepwater Horizon* was involved in oil and gas development on the Outer Continental Shelf.  The first two paragraphs of paragraph 18 of the TERMS AND CONDITIONS associated with the BOP purchase orders are "knock-for-knock" indemnity provisions made enforceable by the Longshoremen and Harbor Worker's Compensation Act, 33 U.S.C. § 905(c).  Paragraph 15A, the first paragraph of 15B, and paragraph 15C of the MSA together constitute "knock-for-knock" indemnity provisions made enforceable by the Longshoremen and Harbor Worker's Compensation Act, 33 U.S.C. § 905(c).  Paragraphs 9.1(a) and 9.2(a) of the ADT Agreement are "knock-for-knock" indemnity provisions made enforceable by the Longshoremen and Harbor Worker's Compensation Act, 33 U.S.C. § 905(c).  Paragraph 14A of the terms and conditions of the Repair Quotes contains "knock-for-knock" indemnity provisions made enforceable by the Longshoremen and Harbor Worker's Compensation Act, 33 U.S.C. § 905(c).  All the contractual pollution indemnities described above are consistent with the public policies reflected in liability provisions of the Oil Pollution Act of 1990.

### *Failure of TO Holdings and TO Offshore to Satisfy Their Contractual Indemnity Obligations*

57.    On April 20, 2010, explosions and fires occurred in connection with oil development and well control activities conducted in the subsoil of the Outer Continental Shelf from the *Deepwater Horizon* in significant part by authorized agents of Petitioners acting within the scope of their employment.  Thereafter, oil was released underwater from the oil well in the subsoil that was the subject of those oil development activities.  No employee or agent of

Cameron was involved in any of these oil drilling, development, or well control activities at the Macondo well either on the *Deepwater Horizon* or on shore on or before April 20, 2010.

58.     A host of litigants have named Cameron a Defendant in over 400 lawsuits allegedly based on the explosions and fires on April 20, 2010, and/or the resulting underwater oil spill that occurred in connection with the oil development activities as described in paragraph 57, in most cases seeking to impose liability on and recover damages from Cameron as manufacturer of the well control equipment used by the drilling unit without proof of fault, and in other cases apparently seeking to impose liability on and recover damages from Cameron in connection with its repair work on the *Deepwater Horizon*.

59.     All persons on board the *Deepwater Horizon* who perished or were injured as a result of the events of April 20, 2010 as generally described in paragraph 57 were employees and/or invitees of one or more Petitioners within the meaning of the TERMS AND CONDITIONS, the MSA, and the ADT Agreement, and also members of the Buyer Group within the meaning of the Repair Quotes.

60.     Tens of thousands of persons other than those persons described in paragraph 59 have filed lawsuits alleging damages as a result of the oil spill generally described in paragraph 57, again seeking to impose liability on and recover damages from Cameron.

61.     Cameron has made written demand to Petitioners and their pertinent affiliates requesting that they comply with their indemnity obligations under the indemnity provisions of the TERMS AND CONDITIONS and MSA.  None of these Transocean entities has complied fully with these indemnity obligations.

-20-

1053668v.1

62.     Transocean has written to BP America requesting that BP America comply with its obligations under sections 24.2 and 25.1 of the DRILLING CONTRACT with respect to the indemnity claims of Cameron against Transocean entities.  Despite its unambiguous contractual commitment in those sections of the DRILLING CONTRACT to take "full responsibility," and thereby assume responsibility for these indemnity obligations, BP America has not undertaken any responsibility for the alleged pollution liability and resulting costs of Cameron that are the subject of the pollution indemnity provisions of the TERMS AND CONDITIONS and MSA. Petitioners and BP entities have failed to provide to Cameron these benefits of the DRILLING CONTRACT pollution indemnity provision as required by the pollution indemnity provisions of the TERMS AND CONDITIONS and MSA.

### *Responsibility for the Explosion of April 20, 2010, and Ensuing Oil Spill*

63.     In March 2008, BP E&P acquired a lease from the Minerals Management Service of the U.S. Department of Interior to drill a well in the subsea of the Outer Continental Shelf in Mississippi Canyon Block 252, thousands of feet below the surface of the water in the Gulf of Mexico.  In October 2009, BP America began drilling what it named the Macondo well on the MMS lease with a Transocean drilling unit, the *Marianas*.

64.     On January 31, 2010, the *Deepwater Horizon* Mobile Offshore Drilling Unit ("MODU" or "rig") arrived at the MMS lease to conduct further drilling of the Macondo well pursuant to the terms of the DRILLING CONTRACT.  The BOP acquired from Cameron by R&B Falcon was still owned by TO Holdings or one of its affiliates and remained installed on the MODU.  Before the BOP was lowered and affixed to the Macondo wellhead, Petitioners and BP America performed maintenance on and made repairs to the BOP.  Petitioners' rig crew then

-21-

lowered the BOP to the subsea surface and latched it onto the Macondo wellhead.  The MODU was connected to the well through a riser, and with the assistance of Petitioners, BP America resumed drilling the Macondo well.

65.    Under the direction of BP America, the crews of BP and Petitioners drilled to a total well depth in excess of 18,000 feet on April 11, 2010.  At that point, BP America decided that well integrity and safety issues made it unwise to drill any further even though original plans had called for even deeper penetration into the hydrocarbon reservoir in the porous rock.

66.    Between April 11 and 15, 2010, BP America and its contractors ran logging tests and ultimately determined that the reservoir in the porous rock contained sufficient amounts of oil and other hydrocarbons to warrant commercial production.  With Petitioners' assistance, therefore, BP America undertook installation of a final production casing string to prevent influx of hydrocarbons into the well so that BP America could abandon the well temporarily and then produce oil and gas in the future with another drilling unit.

67.    Installation of the production casing string involved cementing the casing into place in the well bore in order to isolate the hydrocarbon-bearing zone in the rock from the annular space around the casing and from the inside of the casing itself.  Halliburton was the cementing contractor.

68.    On April 18 and 19, 2010, the production casing was lowered into position in the Macondo well.

69.    On April 20, 2010, Petitioners' crew and BP personnel, working together, took steps to shut in, secure and abandon the Macondo well for production by another rig before

-22-

disengaging the *Deepwater Horizon*.  As part of the abandonment procedures, Petitioners' crew conducted a positive pressure test and multiple negative pressure tests.

70.     After the positive pressure test and multiple negative pressure tests were completed, however, Petitioners' crew did not successfully maintain control of the well.

71.     After hydrocarbons leaked into the well and begun to shoot up the well to the drilling unit, and after fluids were expelled onto the deck, Petitioners' crew directed the released mud and gas mixture into facilities on the drilling unit rather than overboard.  Evidence further suggests that Petitioners' crew took steps to activate the BOP after fluids and hydrocarbons were expelled onto the deck.  By the time the crew initiated this action, however, substantial hydrocarbons were already in the riser above the BOP.  Once on the rig, hydrocarbons came into contact with an ignition source and ignited, resulting in explosions and fires.

72.     Because substantial hydrocarbons were in the riser prior to the time any well control actions were taken, the BOP could not have prevented the explosions that resulted in the deaths and injuries on April 20, 2010.

73.     After the explosions, personnel on the rig attempted to activate manually the BOP's emergency disconnect sequence.  However, the explosions had most likely already disabled the MUX cable and hydraulic lines between the rig and the BOP on the seabed.  The crew's attempts at manual activation were not successful.  The evidence available to date supports the conclusion that the extraordinary release of hydrocarbons, the resulting explosions and fires, and the forces created thereby overwhelmed the flow control capabilities of the BOP stack as maintained, modified, and operated.  The oil spill generally described in paragraph 57 ensued.

-23-

74.     The combined actions of BP America and BP E&P ("BP") contributed to the explosions, fires, and oil spill generally described in paragraph 105.  The explosions, fires, and oil spill were proximately caused by BP's negligence in the following respects:

a.     Although BP was informed after execution of the Drilling Contract in which it had specified key features of the design of the BOP stack for the *Deepwater Horizon* that upgrades and improvements were available to enhance the capabilities of the BOP stack as sold to Transocean by Cameron, and even though BP required Transocean to make modifications to the BOP stack during the pendency of the Drilling Contract, BP did not require or authorize Transocean to procure important BOP upgrades or improvements.

b.     BP's decision to use a long string production casing for the Macondo well increased the difficulty of preventing leaks of hydrocarbons during the cement job and increased the risk of cementing failure.  In particular, BP's choice of a long string design increased the risk of cement contamination, eliminated the possibility of rotating or otherwise moving the casing in place during the cement job, required higher and more risky cement pumping pressure, and required a complicated and time-consuming squeeze job that BP personnel were encouraged to expedite and therefore complicated the job further.

c.     BP's decision to include rupture disks in and omit a protective casing in its drilling design complicated post-blowout containment efforts.

d.     The BP engineering team unreasonably failed to appreciate all the risk factors in the cementing job.  In particular, BP's decision to use only six centralizers increased the risks of cementing failure.  BP's decision not to follow the "best practice" of circulating

-24-

mud "bottoms up" prior to cementing increased the risks of cementing failure.  BP's decision to pump only about 60 barrels of cement after nitrogen foaming at Macondo magnified the risks of cementing failure in that (i) there would be less cement in the annular space above the hydrocarbon zones; (ii) placement errors might leave insufficient cement in the shoe track or the annular space at the hydrocarbon zone; and (iii) increased the detrimental effects of mud contamination.  In conjunction with Halliburton, BP decided to pump the primary cement at a relatively low rate, decreasing the efficiency of mud replacement and thus increasing the risk of mud-related cementing failures.  BP's decision to use a reamer shoe rather than a float shoe, which provides an extra line of defense against cement contamination, may have increased risks of cementing failure. BP chose not to take precautions against swapping of mud from the rathole for cement in the well's shoe track.  BP may have wrongly concluded that the rig crew had converted the float valves, and such a failure to convert would have compromised the bottomhole cement job.  BP failed to run a cement bond log to assess the adequacy of the cementing job.

e.     The temporary well abandonment procedures implemented by BP unreasonably reduced the number of barriers to hydrocarbon release in the Macondo well and thereby unreasonably increased the risk of hydrocarbon release into the well.  In particular, those abandonment procedures created a severe hydrostatic underbalance in the well, creating undue stress on the cement.  The procedures placed undue reliance on the success of the cement job and timely recognition by the crew of cementing failure.  BP did not follow industry practice in developing its plan to install the lockdown sleeve, instead opting to

1053668v.1

set the lockdown sleeve during the last step in the abandonment procedure, opting to set its surface cement plug in seawater rather than mud, and opting to use drill pipe to set the lockdown sleeve rather than drill collars.

f.      On April 20, 2010, BP personnel failed to interpret a negative pressure test properly, concluding that the test had demonstrated well integrity when in fact the test clearly showed that the cement had failed to isolate hydrocarbons.  In particular, BP personnel were made aware of three instances during the test in which pressure built up after being bled off, demonstrating a release of hydrocarbons into the well.

g.      BP required as a general procedure that mud flow from the well be routed into a mud gas separator on board the vessel rather than overboard, and unreasonably failed to permit or direct diversion overboard of the volatile hydrocarbon mix released on April 20, 2010.

h.      BP management failures lay at the root of all the technical failures described in subparagraphs a. through g. above.  In particular, in choosing a long string casing design, BP unreasonably increased short-term blowout risks in order to achieve perceived long term production benefits.   BP unreasonably emphasized the risk of annular pressure buildup and effectively de-emphasized equally important blowout risks and alternative casing design to reduce those risks appropriately.   BP's management processes unreasonably failed to force the Macondo team to identify and evaluate all cementing risks or their combined impact.  The BP Macondo well team did not provide effective quality assurance on Halliburton's technical services.  BP did not properly manage design changes and procedural modifications affecting the success of the cement job.   BP

-26-

mismanaged use of Halliburton's computer modeling of the cement design and cementing operations. BP failed to evaluate the significance of float conversion difficulties. BP misinterpreted data indicating cementing success or failure. BP unreasonably failed to run a cement evaluation log that was necessitated by its well abandonment procedures. BP did not adequately supervise Halliburton's cementing work, particularly in the context of a foam slurry design for the cement with which BP had previously faced difficulties, because BP relied on demonstrably poor work by Halliburton personnel, failed to insist on completion of foam stability tests, and accepted transparently questionable slurry recipes. BP failed to develop its temporary abandonment procedure in a timely manner. BP did not conduct a risk assessment of last minute changes in its temporary abandonment procedure. BP allowed equipment availability to govern critical design and procedure decisions in the well abandonment process. BP management failed to provide written standardized guidance for temporary abandonment procedures. BP did not have pre-established standard procedures for conducting or interpreting a negative pressure test. BP did not adequately train its personnel to conduct or interpret negative pressure tests. For Macondo, BP had virtually no written procedures for the test. BP failed to alert other rig personnel that it was relying exclusively on the negative pressure test to conclude that the cement job was successful. BP personnel on the MODU were not vigilant to detect a kick of hydrocarbons into the well during final displacement of well fluids for abandonment. BP allowed MODU operations to proceed in a way that inhibited well monitoring. BP personnel on the MODU did not properly communicate information to Transocean or

-27-

Halliburton personnel.  BP unduly emphasized the need to avoid diversion of well flow overboard.  In general, BP failed to use its own experts effectively, failed to supervise its contractors adequately, and improperly assessed the risks of cementing failure and resulting blowout.

75.     Actions of Petitioners contributed to the explosions, fires, and oil spill generally described in paragraph 57.  The explosions, fires, and oil spill were proximately caused by Petitioners' negligence in the following respects:

a.      Although Petitioners were informed after transfer of title to the BOP stack that BOP upgrades and improvements were available to enhance the capabilities of the BOP stack as sold by Cameron to Petitioners, Petitioners did not procure important upgrades or improvements.

b.      Petitioners' rig crew unreasonably failed to appreciate all the risk factors in the cementing job.  In particular, Petitioners' personnel concluded that a float check procedure was successfully accomplished when the data actually showed that the results of the procedure were inconclusive.

c.      On April 20, 2010, Petitioners' personnel failed to interpret a negative pressure test properly, concluding that the test had demonstrated well integrity when in fact the test clearly showed that the cement had failed to isolate hydrocarbons.  In particular, Petitioners' personnel were made aware of three instances during the test in which pressure built up after being bled off, demonstrating a release of hydrocarbons into the well.

d.      On April 20, 2010, Petitioners' crew unreasonably failed to recognize warning signs of a release – a "kick" – of hydrocarbons into the well.  Moreover, a series of activities conducted by Petitioners' personnel on the rig at the time of the release of hydrocarbons unreasonably complicated detection of the warning signs.  Even when the Petitioners' rig crew began to become aware of warning signs, Petitioners' personnel failed to interpret those signs as a kick until hydrocarbons had entered the riser and therefore unreasonably failed to respond to the kick at a time when the kick could have been controlled.

e.      On April 20, 2010, after the blowout, Petitioners' crew unreasonably diverted the transparently enormous flow of released hydrocarbons into a mud gas separator rather than overboard.

f.      To the extent that the BOP stack did not function on April 20, 2010, any such failure of the equipment to operate was the consequence of, among other things, the release of hydrocarbons and explosion, unreasonably slow or improper reactions by Petitioners' crew to evidence of a kick as described in subparagraph c. above, design decisions established in Petitioners' and Vastar/BP's technical specifications for the BOP stack, modifications to the BOP not made by Cameron, and/or unreasonably lax maintenance of the BOP by Petitioners.

g.      Management failures by Petitioners lay at the root of many of the technical failures described in subparagraphs a. through f. above.  In particular, Petitioners did not have pre-established standard procedures for conducting or interpreting a negative pressure test.  Petitioners did not adequately train their personnel to conduct or interpret

-29-

negative pressure tests. Petitioners' rig personnel were not reasonably diligent during the final phases of well abandonment. Petitioners did not adequately train their rig personnel to recognize the data evidencing kicks. Petitioners did not inform its rig personnel about lessons that had been learned in a previous analogous incident. Petitioners allowed rig activities to interfere with well monitoring. Petitioners' personnel did not adequately communicate information among themselves or with Petitioners' or BP's decision-makers. Petitioners failed to train their employees to deal adequately with low-frequency, high-risk events.

76.    The explosions, fires, and oil spill described in paragraph 57 were proximately caused by the negligence of Cross-Defendant Halliburton. Halliburton's negligence contributed to the explosions, fires, and oil spill generally in the following respects:

a.    Halliburton unreasonably provided a nitrogen foam cement slurry that had been demonstrated to be unstable and inadequate to prevent the blowout by Halliburton's own analyses of the slurry design. Halliburton failed to inform BP about all the results of Halliburton's analysis of the chosen slurry design. Internal Halliburton experts did not review the Macondo slurry design. Halliburton unreasonably failed to ensure that its responsible slurry engineer conducted timely slurry tests. Halliburton unreasonably failed to redesign the unstable slurry to reflect the results of its tests, the results of its computer modeling, or BP's changes in well design and plans for well abandonment.

b.    Halliburton acted unreasonably by beginning the cement job before adequately analyzing its most current test results.

-30-

c.      Halliburton failed to inform BP about the risks inherent in the abandonment procedures followed by BP. Halliburton unreasonably failed to recommend that BP run a cement bond log. Halliburton unreasonably stated that the cement job was a success in the absence of valid data to support that conclusion.

d.      Halliburton mud loggers unreasonably failed to recognize warning signs of a release – a "kick" – of hydrocarbons into the well. Halliburton mud loggers were inadequately diligent during final mud displacement. Halliburton mud loggers unreasonably failed to communicate critical information to other persons on the rig involved in well monitoring during final displacement.

77.     No Cameron personnel were on board the MODU on April 20, 2010.

78.     No Cameron personnel were involved in the testing or maintenance of the BOP in 2010.

79.     No Cameron personnel were involved in the well design for the Macondo well.

80.     No Cameron personnel were involved in the well abandonment process for the Macondo well.

81.     No Cameron personnel were involved in the cementing process for abandonment of the Macondo well.

82.     No Cameron personnel were involved in conducting or interpreting the negative pressure test on April 20, 2010.

83.     No Cameron personnel were involved in monitoring the Macondo well during the well abandonment process.

-31-

84.     On April 20, 2010, persons or entities other than Cameron modified the BOP from its condition when title transferred in 2001.

85.     On April 20, 2010, the BOP had been substantially maintained by persons other than Cameron.

86.     No Cameron personnel were involved in any decision, action, or inaction on the MODU or onshore that was a proximate cause of the explosions generally described in paragraph 57.

87.     No Cameron personnel were involved in any decision, action, or inaction on the MODU or onshore by BP, Petitioners, Halliburton, or any other party that was a proximate cause of the oil spill generally described in paragraph 57.

### Causes of Action

### *First Claim – Contractual Indemnity Against TO Offshore, TO Deepwater and Triton*

88.     Pursuant to the terms of the MSA, Cameron is entitled to complete indemnity from TO Offshore, TO Deepwater, and Triton for any liability that Cameron may have to any Claimant, Cross-Plaintiff, or Third-Party Plaintiff in this limitation action.  To the extent that Cameron pays any judgment covered by the indemnity, Cameron is entitled to be reimbursed by these Petitioners for breach of the indemnity provisions of the MSA.

89.     Pursuant to the terms of the MSA, Cameron is entitled to recover from TO Offshore, TO Deepwater, and Triton the attorneys fees and other costs that it will have reasonably incurred to defend any claims in this limitation action.

90.     Pursuant to the terms of the MSA, Cameron is entitled to recover from TO Offshore, TO Deepwater, and Triton its reasonable attorneys' fees incurred in enforcing the indemnity obligations described in paragraphs 41-44.

### *Second Claim – Declaratory Judgment Concerning Contractual Indemnity Obligations of TO Offshore, TO Deepwater and Triton*

91.     Pursuant to 28 U.S.C. § 2201, Cameron is entitled to a declaratory judgment that under the terms of the MSA, Cameron is entitled to complete indemnity from TO Offshore, TO Deepwater and Triton without limitation under 46 U.S.C. 30501 et seq. for any liability that Cameron may incur to any person seeking to recover damages on account of the events of April 20, 2010 described above.

92.     Pursuant to 28 U.S.C. § 2201, Cameron is entitled to a declaratory judgment that, without limitation under 46 U.S.C. § 30501 et seq., Cameron is entitled by the terms of the MSA to recover from TO Offshore, TO Deepwater, and Triton all costs that Cameron incurs to defend against the claim of any person seeking to recover damages on account of the events of April 20, 2010.

93.     Pursuant to the terms of the MSA, Cameron is entitled to recover from TO Offshore, TO Deepwater, and Triton its reasonable attorneys' fees and other costs incurred in enforcing the indemnity obligations described in paragraphs 41-44.

### *Third Claim – Contractual Indemnity Against TO Holdings*

94.     Pursuant to the terms of the TERMS AND CONDITIONS, Cameron is entitled to complete indemnity from TO Holdings for any liability that Cameron may have to any Claimant, Cross-Plaintiff, or Third-Party Plaintiff in this limitation action.  To the extent that Cameron pays

-33-

any judgment covered by the indemnity, Cameron is entitled to be reimbursed by TO Holdings for breach of the indemnity provisions of the TERMS AND CONDITIONS.

95.     Pursuant to the terms of the TERMS AND CONDITIONS, Cameron is entitled to recover from TO Holdings the attorneys' fees and other costs that it incurs to defend the claims of any Claimant, Cross-Plaintiff, or Third-Party Plaintiff in this limitation action.

### *Fourth Claim – Declaratory Judgment Concerning Contractual Indemnity Obligations of TO Holdings*

96.     Pursuant to 28 U.S.C. § 2201, Cameron is entitled to a declaratory judgment that under the indemnity provisions of the TERMS AND CONDITIONS, Cameron is entitled to complete indemnity without limitation under 46 U.S.C. § 30501 from TO Holdings for any liability that Cameron may incur to any person seeking to recover damages on account of the events of April 20, 2010.

97.     Pursuant to 28 U.S.C. § 2201, Cameron is entitled to a declaratory judgment that, without limitation under 46 U.S.C. § 30501, Cameron is entitled by the indemnity provisions of the TERMS AND CONDITIONS to recover from TO Holdings all attorneys' fees and other costs that Cameron reasonably incurs to defend against the claim of any person seeking to recover damages on account of the events of April 20, 2010.

### *Fifth Claim – Contractual Indemnity Under the ADT Agreement*

98.     Pursuant to the terms of the ADT Agreement, Cameron is entitled to complete indemnity from Petitioners as successors to ADT under the ADT Agreement for any liability that Cameron may have to any Claimant, Cross-Plaintiff, or Third-Party Plaintiff in this limitation action.  To the extent that Cameron pays any judgment covered by the indemnity, Cameron is

-34-

entitled to be reimbursed by these Petitioners for breach of the indemnity provisions of the ADT Agreement.

99.     Pursuant to the terms of the ADT Agreement, Cameron is entitled to recover from Petitioners the attorneys fees and other costs that it will have reasonably incurred to defend any claims in this limitation action.

### Sixth Claim – Declaratory Judgment Concerning Contractual Indemnity Obligations Under the ADT Agreement

100.     Pursuant to 28 U.S.C. § 2201, Cameron is entitled to a declaratory judgment that under the terms of the ADT Agreement, Cameron is entitled to complete indemnity from Petitioners without limitation under 46 U.S.C. 30501 et seq. for any liability that Cameron may incur to any person seeking to recover damages on account of the events of April 20, 2010 described above.

101.     Pursuant to 28 U.S.C. § 2201, Cameron is entitled to a declaratory judgment that, without limitation under 46 U.S.C. § 30501 et seq., Cameron is entitled by the terms of the ADT Agreement to recover from Petitioners all costs that Cameron incurs to defend against the claim of any person seeking to recover damages on account of the events of April 20, 2010.

### Seventh Claim – Contractual Indemnity Under the Terms of Repair Quotes

102.     Pursuant to the terms of the Repair Quotes, Cameron is entitled to complete indemnity from one or more Petitioners for any liability that Cameron may have to any Claimant, Cross-Plaintiff, or Third-Party Plaintiff in this limitation action.  To the extent that Cameron pays any judgment covered by the indemnity, Cameron is entitled to be reimbursed by one or more Petitioners for breach of the indemnity provisions of the Repair Quotes.

-35-

103.    Pursuant to the hold harmless terms of the Repair Quotes, Cameron is entitled to recover from Petitioners the attorneys fees and other costs that it will have reasonably incurred to defend any claims in this limitation action.

### Eighth Claim – Declaratory Judgment Concerning Contractual Indemnity Obligations Under the Repair Quotes

104.    Pursuant to 28 U.S.C. § 2201, Cameron is entitled to a declaratory judgment that under the terms of the Repair Quotes, Cameron is entitled to complete indemnity from Petitioners without limitation under 46 U.S.C. 30501 et seq. for any liability that Cameron may incur to any person seeking to recover damages on account of the events of April 20, 2010 described above.

105.    Pursuant to 28 U.S.C. § 2201, Cameron is entitled to a declaratory judgment that, without limitation under 46 U.S.C. § 30501 et seq., Cameron is entitled by the hold harmless terms of the Repair Quotes to recover from Petitioners all costs that Cameron incurs to defend against the claim of any person seeking to recover damages on account of the events of April 20, 2010.

### Ninth Claim – Non-Contractual Indemnity

106.    Cameron asserts that it is not liable for any damages in connection with the events of April 20, 2010 on the MODU or the ensuing oil spill and that general maritime law does not govern the liability of Cameron or Petitioners for those events.  To the extent that general maritime law applies and Cameron is held liable to any Claimant, Cross-Plaintiff, or Third-Party Plaintiff in this limitation action but is not indemnified by Petitioners by reason of the express indemnity provisions of the MSA, TERMS AND CONDITIONS, the ADT Agreement, or the

-36-

1053668v.1

Repair Quotes, Cameron is entitled to complete non-contractual indemnity jointly and severally from Petitioners, BP America, BP E&P, and Halliburton because of their negligent contribution to the events leading to any such Cameron liability not based on Cameron's negligence.

### *Tenth Claim – Contribution Under OPA*

107.    The Oil Pollution Act of 1990 provides that any "person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."  33 U.S.C. § 2709.  Petitioners, BP E&P, Anadarko Corp., Anadarko E&P, and MOEX Offshore are designated and/or defined "responsible parties" under the terms of OPA with respect to the oil spill generally described in paragraph 57, and are therefore "liable or potentially liable under this Act" within the meaning of section 2709 for certain damages covered by OPA.  *See* 33 U.S.C. §§ 2701(32), 2702(a), (b).  Based on allegations of the Complaint and the allegations of claims made in this action, each Petitioner and each of the Cross-Defendants may also be held "liable or potentially liable under another law," be it Louisiana law as surrogate federal law under the Outer Continental Shelf Lands Act as Cameron asserts, or general maritime law as others assert, for damages covered by OPA.  Cameron asserts that it is not liable for any damages in connection with the events of April 20, 2010 on the MODU or the ensuing oil spill. To the extent that Cameron is held jointly liable with any Petitioner or any Cross-Defendant to any Claimant, Cross-Plaintiff, or Third-Party Plaintiff in this limitation action for damages covered by 33 U.S.C. § 2702(b) but is not indemnified for such liability, Cameron is entitled to contribution from all such Petitioners or Cross-Defendants under the terms of 33 U.S.C. § 2709.

1053668v.1

## *Eleventh Claim – Contribution from Petitioners and Cross-Defendants Under General Maritime Law*

108.   Cameron asserts that it is not liable for any damages in connection with the events of April 20, 2010 on the MODU or the ensuing oil spill and that general maritime law does not govern the liability of Cameron or Petitioners and Cross-Defendants for those events.  To the extent that general maritime or other law nevertheless applies and any party succeeds with proof of any allegations so that Cameron is held jointly liable with any Petitioner or Cross-Defendant to any such claimant, Cross-Plaintiff, or Third-Party Plaintiff under general maritime or other law in this limitation action, Cameron is entitled to contribution from all such Petitioners and Cross-Defendants on the basis of comparative fault.

## Demand for Judgment

WHEREFORE, Cameron International Corporation ("Cameron") demands judgment from Petitioners as follows:

1. That Petitioners take nothing by their Petition and Complaint;

2. That the Restraining Order be modified to permit Cameron International Corporation to prosecute in a separate lawsuit all of the foregoing claims against Petitioners that are not subject to limitation under 46 U.S.C. § 30505;

3. That Cameron recover indemnity from Petitioners for any liability that Cameron incurs to any party in this limitation action, including repayment of any amount paid by Cameron to resolve any such liability;

-38-

4.  That Cameron recover from Petitioners the attorneys' fees and other costs it incurs in defending the claims of any Claimant, Third-Party Plaintiff, or Third-Party Defendant in this limitation action;

5.  That Cameron be awarded a declaratory judgment that Petitioners are obligated by written agreement to indemnify Cameron for any liability incurred by Cameron to any person asserting claims based on the casualty of the *Deepwater Horizon* on April 20, 2010;

6.  That Cameron be awarded a declaratory judgment that Petitioners are obligated by written agreement to reimburse Cameron for all attorneys' fees and other costs reasonably incurred by Cameron defending the claim of any person based on the casualty of the *Deepwater Horizon* on April 20, 2010;

7.  That Cameron recover from Petitioners its reasonable attorneys' fees and other costs incurred in enforcing their indemnity obligations under the MSA;

8.  That in the alternative, Cameron recover complete indemnity from Petitioners, BP America, BP E&P, and Halliburton for any liability that Cameron incurs to any Claimant, Third-Party Plaintiff or Third-Party Defendant in this limitation action on the ground that Cameron is not a negligent defendant;

9.  That in the event Cameron is held jointly liable with any Petitioner or Cross-Defendant for damages covered by 33 U.S.C. § 2702(b), Cameron recover contribution from such Petitioners and/or Cross-Defendants pursuant to the terms of 33 U.S.C. § 2709;

1053668v.1

10. That in the alternative, in the event Cameron is held jointly liable with any Petitioner or Cross-Defendant for damages under general maritime or other law, Cameron be awarded contribution from such Petitioners and/or Cross-Defendants under general maritime law or other law;

11. That Cameron recover from Petitioners and Cross-Defendants its costs of court in this action; and

12. That Cameron recover such other and further relief from Petitioners and Cross-Defendants to which it may show itself entitled.

Respectfully submitted,

David J. Beck, T.A.
    dbeck@brsfirm.com
Joe W. Redden, Jr.
    jredden@brsfirm.com
David W. Jones
    djones@brsfirm.com
Geoffrey Gannaway
    ggannaway@brsfirm.com

BECK, REDDEN & SECREST, L.L.P.
One Houston Center
1221 Mckinney, Suite 4500
Houston, TX  77010-2010
713-951-3700
713-951-3720 (fax)

*/s/ Phillip A. Wittmann*
Phillip A. Wittmann, 13625
    pwittman@stonepigman.com
Carmelite S. Bertaut, 3054
    cbertaut@stonepigman.com
Keith B. Hall, 24444
    khall@stonepigman.com
Jared Davidson, 32419
    jdavidson@stonepigman.com

STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
504-581-3200
504-581-3361 (fax)

**ATTORNEYS FOR CAMERON INTERNATIONAL CORPORATION**

1053668v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Consolidated Memorandum of Defendant Cameron International Corporation in Support of its Motion to Dismiss the Pleadings in the "A" Bundle has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of April, 2011.

*/s/ Phillip A. Wittmann*

1053668v.1